**C. A. DeLong,** Contestant, v. **David Brown,** Incumbent,
Appellant.

**Evidence:** *Preliminary showing as to competency.* The ballots
cast at a general election, and required by Code, section 1142,
1　　to be preserved by the county auditar, are not competent evi-
dence in an election contest, without showing that they have
been properly preserved.

*Objection available without plea.* The objection that ballots cast
at a general election and required by Code, section 1142, to be
2　　preserved by the county auditor are not admissible in an elec-
tion contest because not shown to have been properly preserved,
may be urged, though the incompetency of such ballots is not
alleged in the pleadings.

**Review on appeal:** *Ruling on competency.* The finding of the
trial court in an election contest that the ballots cast at a gen-
eral election, and required by Code, section 1142, to be preserved
3　　by the auditor, are incompetent, as not having been properly

preserved, will not be disturbed on appeal unless it has no support in the evidence.

Election Contests: BALLOTS AS EVIDENCE: *Preservation* and *competency.* Code, section 1142, requires the county auditor to carefully preserve the ballots cast at a general election. The vault in the auditor's office consisted of an upper and lower section; the latter being in the basement, and having no lock and an outside window, the vault was reached by a stairway from the auditor's office. The auditor received the ballots cast at the general election, and deposited them for a time in the upper vault, and then transferred them to the lower, where they remained 49 days, till they were used in an election contest. They were not enclosed in the paper envelopes in which they returned by the various election boards but were left in the original envelopes on the floor of the vault. Two of the envelopes were so sealed that when examined at a contest, ballots could be extricated, and the seals on others were of such a character that they could be opened and re-sealed without detection. The auditor was shown to have allowed certain attorneys, abstracters, county officials and others to have access to and use of the vault unattended, though such use was restricted to persons known to the auditor. *Held,* that the negligence in preserving the ballots rendered them incompetent in an election contest.

*Appeal from Tama District Court.*—HON. OBED CASWELL, Judge.

WEDNESDAY, APRIL 10, 1901.

ELECTION contest over the office of county superintendent of schools. From judgment,declaring contestant elected, the incumbent appeals.—*Reversed.*

*Caldwell & Walters* and *R. P. Fitzgerald* for appellant.

*G. R. Struble* for appellee.

LADD, J.—The statute requires the auditor to carefully preserve the ballots received from the judges of election for six months. Section 1142, Code. The particular manner or place is not pointed out. If carefully done, this precludes any reasonably well founded suspicion that they may

have been changed or tampered with, and in such event they form the best evidence of who has been elected. With their integrity thus fully established, they are silent witnesses which can neither err nor lie. And it is generally held, where the manner or mode of preservation has been enjoined by statute, a substantial compliance therewith must be shown, preliminary to the introduction of ballots in evidence. *Davenport v. Olerich,* 104 Iowa, 194, and cited cases; *Mentzer v. Davis,* 109 Iowa, 528; *Hudson v. Solomon,* 19 Kan. 177; *Sone v. Williams,* 130 Mo. Sup. 530 (32 S.W. Rep. 1016). See decisions collected in 10 Am. & Eng. Enc. Law, 732, 830; also in briefs to *Tebbe v. Smith,* 108 Cal. 101 (41 Pac. Rep. 454, 29 L. R. A. 673). The rule seems to prevail in Texas that if the ballots come from their lawful custodian in obedience to an appropriate writ, and are produced in court apparently intact, they are *prima facie* admissible. *Hunnicutt v. State,* 75 Tex. 233 (12 S. W. Rep. 106); *Gray v. State,* 19 Tex. Civ. App. 521 (94 S. W. Rep. 699). While these circumstances, and also the presumption obtaining that an officer has performed his duty, should be given weight, we do not think they alone afford sufficient assurance of the identity and genuineness of the ballots. The official count as finally declared with respect to county officers is the ultimate conclusion of many officers presumed to have faithfully performed their respective duties, and concerning the correctness of which a very strong presumption obtains—so strong that it ought not to be overcome by evidence, peculiarly susceptible of change, unless proven, not merely presumed, to have been properly preserved. This preliminary proof, unless waived, is essential to the competency of the ballots as evidence for any purpose as against the official count, and certainly no averment in the pleading is required as a basis for an objection to such incompetency. In *Furguson v. Henry,* 95 Iowa, 439, it was merely held that, although the ballots had been received in evidence, the incumbent might show them not to

be the same as voted, or counted by the judges of election. What was said of the ballots coming through regular channels was by way of argument. The character of preliminary proof required was neither involved nor decided.

II. But the question of the competency of the ballots as evidence is one of fact, to be determined by the trial court; and, as the action is by ordinary proceedings, its finding cannot be disturbed unless without sufficient support in the evidence. *Tebbe v. Smith,* 108 Cal. 101 (41 Pac. Rep. 455, 29 L. R. A. 673); *People v. Livingston,* 79 N. Y. 290;*Hughes v. Holman* 23 Or. 48 (32 Pac. Rep. 298); *People v. Cicott,* 16 Mich. 283 (97 Am. Dec. 141). But the weight to be given to evidence and its admissibility are different matters. For this reason it is often difficult to determine whether the ballots, although the irregularities in their presentation may not justify their rejection as evidence, should be accepted, when their actual condition is disclosed, as better proof of who has been elected than the official count. In other words, there are always the two issues in such a case: (1) Were the ballots so preserved as that they should be received in evidence? and, (2) if so received, are they, in view of the manner in which they have been kept, and their condition when examined, entitled to greater credit than the count as made by the officers of election?

III. The evidence disclosed that connected with the auditor's office is a vault, and below that another, in the basement, reached from the first by an iron stairway. The first was entered from the office through iron doors having a combination lock, and there appears to have been no door to the second or lower vault, though it had an outside window, hung by cords and weights. The desk of the auditor and his deputy was so located that they could notice persons enter the vault, but could not see them after having gone in. The ballots before being received had been placed in paper envelops or sacks about 6x14 inches, and 16

inches deep. These had been fastened by seals when received by the auditor, except one which was broken in order to extract the poll book, inadvertently included. The sacks when received were put in the upper vault, on the floor, under the table, but with no other covering, and remained there until after the canvass by the board of supervisors. They were then taken to the lower vault and placed on a box about a foot above the floor, and there remained until the trial before the contest board, said by appellant to have been 49 days after the election. At that time the sealing wax on some of the sacks had been cracked or broken by handling, but not so as to release the cords fastening them. The wax had been stamped with the seals of the respective townships, but not always making a good impression. In one instance the wax did not cover the cords, and by untying these the sack could be opened halfway without tearing. The seal of another was broken, but not so as to open, and the ends of the wires on which the ballots were strung were twisted, but not sealed. Still another did not have the cord through one side, and a space six to eight inches was not closed. In four of the sacks or envelopes the ballots were not folded, and in three they were not strung on wires. In another they were not wired, and there were four ballots more than the number of electors entered on the poll book. The auditor during this time made no count of the packages, and only glanced at them casually when he happened to be in the vault, to see that the pile of envelopes had not been disturbed. The auditor does not pretend to name all who were in the vault unattended while the ballots were there. He admits that three abstractors, four attorneys, the county treasurer, and the court-house janitor had free access to the vaults; but all these testify that, though having the opportunity, they did not tamper with the ballots. Some of these testify to seeing persons examining the records in the vault when they entered. Besides these are mentioned three persons who frequently examined the returns of pharmacists of sales of liquors in the vaults, who may

have been allowed in the upper vault unattended; and the members of the board of supervisors were allowed free access. None of these were called as witnesses and it is to be said that the auditor has no recollection of any of them being in there during this time, though they may have been. With respect to his care and observation a better understanding can be had from his own testimony: "I most always noticed to see who went in there, and if I should hear any one in there, and not know who it was, I always went to see who it was. * * * When people wished to go into the vault during that time I accompanied a good many of them who were not in the habit of going in there daily, outside of abstractors. * * * Anybody that is not familiar with the office would not go in there unless I knew what their business is. Q. But if people came in there, desiring to examine the records, and do not call on you for assistance, was it not your habit then, and is it not now, to permit them to pursue their investigation without your accompanying them? A. It is with a few, yes, sir; not everybody. Some records are kept in the lower vault. I presume people have a right to go down and look at them. I would have to go to the door of the vault to see what people in the lower vault were doing. I could see probably within a foot from where the envelopes were piled up from the door of the vault. To see the whole vault it would be necessary to go down the spiral stairway. I don't know of anyone going down there without my accompanying them. Certain people went into the vault during the time those envelopes were there, but not every one went who wanted to. Certainly some went in alone. I can't recall anybody whom I accompanied into the vault. I have no recollection of any one else going in [save those referred to]. That embraces all the people that I refer to as having gone into my office during the time named, except I went with them. If some one else were named, I would know whether I went or not. On an average, there are one or two persons go into the vault every day. I did not always accompany

them. There are probably half a dozen people, and might be more, whom I permit to go in there without accompanying them. I go in with people if they need my assistance. I nearly always stay with people when they go in there, and assist them, and when they complete their business they come out again. I do not recollect of any one to whom I furnished the books that were called for, and then leave them there with the books. There might be one or two persons that way. The vaults are almost always open when the office is open. There are times, I guess, when both of us [he and deputy] are out of the office, but not a very long period. Have no recollection of this happening."

IV. From this evidence it may well be said that the ballots were not beyond the reach of any one who might have had access to the vaults, and were not so placed or guarded as that any interference therewith would have been at all likely to be detected. The ballots in two of the envelopes, at least, might have been changed without disturbing the seals, and the seals of others were not so stamped as to obviate opening and resealing without detection. In such a case it cannot be expected that any actual interference will be shown, nor that testimony of those having the opportunity to meddle therewith, and denying having done so will be refuted. The effectiveness of the tampering necessarily depends on the secrecy with which it is done, and ordinarily the ballots themselves alone bear witness to the facts. The memory of election judges will hardly retain knowledge of the markings of the ballots when counted. So that in the very nature of things perfect safety may be attained only by placing them beyond the reach of unauthorized persons. This could have been done with slight trouble and little expense, or the auditor might have accompanied all who entered the vaults, and fastened the window. As said in the *Davenport Case,* "the duty of preserving them is not a negative one of noninterference, but a positive requirement to do whatever may be necessary in order to accomplish the purposes of the

law in keeping them inviolate." Perfection, however, is only aimed at, not required, in this world, and all necessary is that the ballots "shall not be so exposed to the reach of unauthorized persons as to afford a reasonable possibility of their having been tampered with." *Mentzer v. Davis, supra.* It is evident from his testimony that the auditor allowed any one in the vaults in whom he reposed confidence. Were it certain that such confidence might never be betrayed, there would be little difficulty in this class of cases. We have at best, only his opinion that others than those named were not in the vaults alone. That people might have entered without his knowledge is conceded, else he would not, on hearing some one in the vaults, have been compelled to learn who they were. All members of the board of supervisors and three others may have been there. He does not know. Nothing but the cobwebs and dust about the open window kept others still from entering. Could they not have gone or reached in and procured some of the envelopes without disturbing the cobwebs and dust, but casually noticed, so that this might not have been detected a month later? No precaution whatever was taken with respect to the protection of the ballots, save in throwing the envelopes in the vaults; otherwise the affairs of the office were conducted the same as at any other time. That there was a reasonable possibility of their having been tampered with is put beyond question by this record. It depended wholly on the motive of evilly disposed persons in the community. Ballots so negligently preserved ought to be given no consideration whatever, and should have been rejected. For the error in admitting them in evidence as genuine and identical with the ballots cast, the judgment is REVERSED.