JOHN W. DOAK, Appellee, v. L. R. BRIGGS, Appellant.

Elections: CONTEST: PRESERVATION OF BALLOTS: COMPETENCY AS
1  EVIDENCE. Under the statute the duty of a county auditor in preserving the ballots of an election is not a negative one of noninterference, but the positive requirement to do what is necessary to accomplish the purpose of the law in keeping them inviolate; and where it appears that they have been exposed to fraudulent alterations, or to the public, or handled by unauthorized persons they are rendered incompetent as evidence in an election contest to overthrow the official returns, whether actually altered or not.

Same. Where the custodian of ballots is personally interested in
2  the result of the election a closer examination of his conduct with reference to a preservation of the same and the returns of the election is required than would otherwise be the case.

**Same:** EVIDENCE. Evidence reviewed and held to show such failure to protect and preserve the ballots of an election as to render them inadmissible in evidence for the purpose of overcoming the official returns.

*Appeal from Mahaska District Court.*— HON. BYRON W. PRESTON, Judge.

FRIDAY, MAY 8, 1908.

REHEARING DENIED MONDAY, OCTOBER 5, 1908.

THIS is a contested election case. At the general election held in Mahaska county, November 6, 1906, the respective parties to this action were opposing candidates for the office of county auditor. In making the official canvass of the votes cast, the county board found that appellee, Doak, had received 2,948 votes, and the appellant, Briggs, 2,957 votes — a majority of 9. A certificate of election was issued to Briggs accordingly. In due time Doak filed his statement of intention to contest the election. The grounds, as stated, were that, in certain election precincts named, ballots were counted for Briggs which should not have been counted; that ballots which should have been counted for the contestant were not so counted; that upon a proper count a majority of the legal votes cast in the county were in favor of contestant. Following this, such proceedings were had as that a court of contest was duly organized as provided by statute, before which the incumbent, Briggs, appeared and filed his answer. Therein he denied the averments of contestant's statement; alleged that in each of the precincts named in the statement legal ballots were cast for him which were not counted, and many illegal ballots were counted for contestant. It was then alleged " that said ballots cannot be recounted, nor can there be a contest involving the recounting of the ballots, for the reason that the same have not been preserved according to law." On the issues so joined, a trial was had — which involved a recount of the ballots —

resulting in a finding that contestant had been elected by a majority of seventy-seven votes. An appeal was taken to the district court and a trial had, with the result that the finding of the court of contest was affirmed. The appeal to this court by incumbent, Briggs, followed.— *Reversed.*

*S. B. Reynolds* and *L. C. Blanchard,* for appellant.

*Jno. O. Malcolm* and *Burrell & Devitt,* for appellee.

BISHOP, J.— The ballots were not recounted on the trial in the court below. At the threshold of the trial it was agreed that " a count of the ballots as they now appear, if admissible in evidence, shows a greater number of ballots for the contestant than for the incumbent, to wit, . . . majority in favor of contestant, 77." In entering into this stipulation, however, the incumbent reserved the right to insist upon his claim and objection that the ballots had not been properly preserved, and that " a recount thereof for the purpose of determining the votes cast would be incompetent." And upon this issue alone the case was tried.

Accordingly, as the case is presented to us, we have this as the situation: If the objection by the incumbent that the ballots were not admissible in evidence on the trial of the contest, the finding as made by the county board of canvassers must prevail, and the incumbent be awarded the office; if the ballots were admissible, the judgment of the court of contest must be approved, and the contestant awarded the office. The charge in detail of irregularity in the preservation of the ballots, as found in the answer, is this: That the ballots " have been in the possession of the contestant (then in possession of the office of auditor under a previous election) himself, and under his control since they were returned by the judges of election, . . . and they have at all times been left subject to inspection and with opportunity to any person to tamper with such ballots, and

they have not been preserved with a jealous care which precludes the opportunity of being tampered with, and that persons, other than the contestant, have had access and opportunity to tamper with said ballots."

The statute, Code, section 1142, prescribes the steps which shall be taken by the judges of election to preserve the ballots after the same have been counted, as follows: " The judges shall fold in two folds and string closely upon a single piece of flexible wire, all ballots which have been counted by them, . . . unite the ends of such wire in a firm knot, seal the knot in such a manner that it cannot be untied without breaking the seal, enclose the ballots so strung in an envelope, and securely seal such envelope." The further requirement is that the judges shall at once make delivery of the ballots to the auditor with the pollbook, which shall contain a return of the votes cast. And the auditor shall " carefully preserve them (the ballots) for six months." . By section 1143 it is provided that either party to a contest shall have the right to have the ballots opened and all errors in counting or refusing to count corrected.

The duty of preserving the ballots " is not a negative one of noninterference, but a positive requirement to do whatever may be necessary in order to accomplish the purpose of the law in keeping them inviolate." *Davenport v. Olerich,* 104 Iowa, 194. And before the ballots are admissible as evidence in a case of contest, it must be made to appear affirmatively by the contestant that the injunction to carefully preserve has been complied with. " Where ballots cast at an election have been exposed to fraudulent alteration, or changes, or have been exposed to the public, or handled by unauthorized persons, it renders them incompetent as evidence to overthrow the official count and return." *Mentzer v. Davis,* 109 Iowa, 528; *DeLong v. Brown.* 113 Iowa, 370; *Wilson v. Bohstedt,* 135 Iowa, 451; McCrary on Elections, page 209.

1. Elections: contest: preservation of ballots: competency as evidence.

And, where it appears that a custodian of ballots was personally interested in the result of the election in the sanse that he was a candidate for re-election to office, such interest

2. SAME. " is proper matter of consideration, and will call for a closer examination of conduct with reference to the returns." *Murphy v. Lentz,* 131 Iowa, 328.

With these rules of law on the subject in mind, we shall now go to the record for the facts on which a determination of the contest must be made to rest. A careful reading of

3. SAME: evidence. the abstracts — with an occasional reference to the transcript to settle a dispute — satisfies us that in the instance of several precincts, and in several respects, the requirement for preservation was not complied with. It appears that, for the purposes of preserving the ballots and making returns of the election, the county officials had provided each precinct with a box — in some instances metal, and the remainder canvas-covered — in which were to be placed the ballots and pollbooks. For the ballots a muslin sack was provided, and for the pollbook a heavy paper envelope. The metal boxes were provided with a padlock and key, while the canvas-covered receptacles had only a strap and buckle.

Looking now to what was done, it will be sufficient to make reference to two instances. The returns from Jefferson township showed that Doak received 250 votes, and Briggs 145 votes. The judges and clerks of election were severally called as witnesses, and each testified that after being counted the ballots were strung on a wire, and the wire knotted and sealed with wax; that they were then put into the muslin sack, but as the sack was too full to be readily tied the whole was placed in a small grain sack, and this sack was tied and the knot sealed with wax. The sack and the pollbook were then placed in the canvas box, and this was taken by one of the judges to be delivered to the county auditor. When the box was brought before the contest court and opened, it was found that the grain sack was tied with a

piece of binding twine; the knot had evidently been sealed with wax, but the seal was broken. The sack was opened, and it was discovered that the ballots were not in the muslin sack. That sack was found at the bottom of the grain sack. The ballots were counted before the court, and it was found that Doak had thirty-two votes more than the returns credited him with while Briggs fell ten votes short of the returns. The judges and clerks of the township describe in their testimony the manner in which the votes were counted and the tally kept, and they unite in saying that to the best of their knowledge the count was correct as shown by the returns.

In Prairie township, the ballots after being counted were strung on a wire and then rolled up, the wire brought around, knotted and sealed. They were then placed in the muslin sack, which was tied but not sealed. On the sack being taken from the canvas box and opened before the contest court, it was discovered that the seal on the wire knot had been destroyed. On the count of the ballots from this township, Doak gained thirteen votes over the number shown by the returns to have been cast for him. On the subject of their count and return of the votes, the judges and clerks testify substantially as did those from Jefferson township.

The office of the county auditor in the courthouse consists of two rooms — a front room and back room, as they are spoken of. The front room alone is connected by door with the hall. A door opens from the front into the back room, and from the latter there is a door leading to a closet outside the building. The office has no vault, but there is a vault in an adjoining room called the " supervisor's room," and, in respect of this, Rowland alone, as far as appears, was in possession of the lock combination. Keys to the auditor's office were in possession of Doak, Rowland, and one Richmond, the latter being janitor of the building. The returns began coming in on Wednesday morning following the election, and as they arrived were taken charge of either by Doak or by Rowland, and placed in the back room of the

office, and a table was placed across the doorway connecting the rooms as a bar to free passage. The last of the returns were received on Thursday morning, and the whole were then taken by Rowland and placed in the vault in the supervisor's room, where they remained, as far as shown, until the trial before the contest court. As the returns from the various precincts came in, the boxes were opened by Rowland and the pollbook envelopes taken out. On the face of each of these was a statement made by the election clerks of the total vote for each candidate whose name was on the election ballot. Notwithstanding the table across the doorway, newspaper reporters, interested candidates for other offices, county officials, and the chairman of the Republican county committee were allowed to enter the back room, and they were permitted to examine the envelopes and copy the figures appearing thereon. Each of such persons testified, however, that they did not touch the ballot boxes. Both Doak and Rowland declare that they, one or both, were constantly on duty while the office was open, and that no one was permitted to interfere with the boxes. And they both say that when the office was closed to business the doors were securely locked. Richmond, the janitor, testified that he was on duty the evening following the election; that he went home about half past ten o'clock, and as he left he locked the outer doors to the courthouse. On cross-examination he answered that he expected to have favor in event of the re-election of Doak; that he was solicitous for that result. And he admitted that following the announcement of the result of the election by the board of canvassers he sought to make a bet of $500 that Doak would continue in the office of auditor. Doak and Rowland both say that in the event of the re-election of the former it was expected that the latter was to continue in the office as deputy.

Such is the fact situation with which we have to deal. And the question to be answered on consideration thereof is, simply, were the ballots so protected and preserved as to re-

tain their original value as instruments of evidence? It is not sought here to convict any person of having tampered with the ballots. We need not even find as matter of fact that they were tampered with. If exposed to unauthorized manipulation, the result must be the same as though there was proof of actual manipulation; in either event, the evidentiary value thereof was destroyed. Nor does it make any difference whether the exposure took place before or after the boxes reached the office of the auditor. The sanctity of the ballot as an instrument of evidence is the one subject of consideration, and the consequences would be as serious, and hence as fatal, in the one case as in the other. The intent of the law is not simply to guard the ballots from the touch of persons generally, but as against any unwarranted interference therewith on the part of the officer or officers appointed to hold the same in custody. And this must be so, as otherwise it could make no difference if the requirement for preservation was wholly ignored, provided there was proof that the possession of the ballots continued uninterruptedly in the custody of the officer appointed thereto. In the case of Jefferson township, it is certain that some force operated to remove the ballots from the muslin sack and to break the seals. It matters not who did it or why. The fact remains— and, as we have seen, it is the only material one — that the ballots were not preserved with that care which would preclude suspicion attaching to the strange discrepancy found by the court of contest to exist between the count of the ballots and the return made by the election officers. Much of that which is thus said is applicable to the case of Prairie township. Perhaps no reason can be found in the letter of the law forbidding the auditor to open the boxes and take out the pollbooks. So, too, his failure to place the boxes in the vault as fast as received may not ordinarily have been open to criticism. But he was a candidate for re-election, and the two other persons having keys to the office were interested in the result of the count

of the ballots — one of them to the extent even of soliciting a bet against the result of the official canvass. In view of his position, the auditor should have seen to it not only that the ballot boxes were not tampered with, but that, as far as possible, they were kept beyond the touch of unauthorized hands. No good reason appears why they should not have been placed in the vault as fast as received. That it would have been better to have done so, all must admit in view of the unexplained condition of some of the ballot packages, and the discrepancy found by the court of contest between the official returns and the count of the ballots — a discrepancy which had effect to change the result of the election.

On the whole case, we reach the conclusion that the ballots were not admissible in evidence to overcome the official return, and from this it follows that the decree of the court below must be, and it is, *reversed.*