E. M. MATZDORFF, Contestant, Appellant, v. E. A. THOMPSON, Incumbent, Appellee.

No. 42169.

962

DECEMBER 12, 1933.

Whitney, Whitney & Stern, for appellant.

Bailie & Edson, and Frederick F. Faville, for appellee.

KINTZINGER, J.—The facts in this case show substantially that on November 9, 1932, the day after the November election in Buena Vista county, the ballots from all precincts were received by the county auditor, and that in the afternoon of November 9, he placed the sacks containing the ballots in a vault on the basement floor of the courthouse; that the auditor's office had a vault on the first floor of the courthouse. The vault in the basement is directly underneath the vault in his office. The basement vault is not connected with the auditor's office, but is reached by a stairway leading to the basement from the main hallway on the first floor; the foot of the stairway ends at the entrance to a men's public washroom in the basement. There is a storeroom immediately adjacent to the washroom, and the basement vault is adjacent to the storeroom. The washroom is separated from the storeroom by a board partition seven feet high with an open space of about two feet between the top of the partition and the ceiling. There is a wooden door in the partition between the washroom from the storeroom, with no other entrance to the storeroom, except by climbing over the board partition, which might easily be done. There is a heavy wooden door leading into

the vault from the storeroom. This door never had any lock on it before November 19, 1932. There was a lock on the door between the washroom and the storeroom, but there was a sufficient opening between the lock and the door jamb to allow the door to be unlocked by inserting a nail, lead pencil, or beer bottle opener in the opening. The auditor usually opened this door with a key, but other employees around the courthouse opened it with a common beer bottle opener, which for convenience was left on the top of the partition over the door. There was no lock on the door leading into the basement vault and it was kept closed by a common barn door latch, which could be lifted without a key or any other instrument. The auditor placed a lock on this door on November 19, 1932, ten days after the ballots had been placed in the vault. The storeroom adjoining the vault was used by the janitor for storing screens and storm windows, by the county engineer, by the state highway commission for testing cement, and by other employees, for many years. They all used the metal beer bottle opener to enter the storeroom. The vault had always been used by the auditor for storing ballots and election supplies. All county employees and the janitor had keys to the doors of the courthouse.

After the election the ballots were brought into the county auditor's office in heavy canvas sacks. The ballots were in muslin sacks placed inside the canvas sacks. The canvas sacks had a flap, and two straps, and were buckled on the top, but not locked. On the afternoon of November 9th, after the election returns had been all received by the county auditor, he carried the sacks containing the ballots into the basement vault, where they were piled on top of each other in a corner.

At the hearing of the contest board in December, 1932, the sacks were all examined. Many of them were sealed, and all had the appearance of not having been tampered with. Before the ballots were counted it was agreed by the contest board, by the contestant, and by the incumbent that in their opinion the sacks had not been tampered with. The county auditor testified that the sacks were in the same position as when placed in the vault; that the election ballots had always been placed in the basement vault, and there never had been a lock on the vault door. When the ballots were taken out of the sacks, both the inner bags and the ballots were carefully inspected. The auditor testified the sacks were piled in the same way he left them; that they were in the same kind of a

pile as when he put them in, and everything looked exactly the same. In each of the canvas sacks there was another muslin bag containing the ballots. There was nothing in the inner bag except ballots. These bags had a draw string in the opening; some were sealed with wax and some not. One or two of the bags had impression seals, but the others were of common wax with no impression. The auditor took the bags out one at a time for the board's inspection. He said that the pile of sacks showed no indication of having been tampered with or handled by any one.

Some of the county officials, who might have been in the storeroom in November, testified they did not enter the vault or see the sacks therein; and never saw any one else entering the vault. The incumbent, appellee, who was then sheriff, and had been since January, 1929, did not see any outsiders enter the vault or attempt to tamper with the ballots during the month of November, 1932.

The official returns from the election as certified by the board of supervisors gave Thompson, the incumbent, a majority of 11 votes, and the recount by the contest board gave Matzdorff, the appellant, a majority of 32 votes. On the recount Matzdorff gained 56 votes in 12 precincts where the bags were sealed, and 11 votes in two precincts where the bags were not sealed. Thompson gained 17 votes in 4 precincts where the bags were not sealed, 7 votes in one precinct where the bag was sealed. In four precincts where the bags were sealed and in two precincts where the bags were unsealed there was no change; in one precinct where the bag was unsealed each gained one vote.

The sacks containing the ballots were placed in the basement vault by the auditor on November 9, 1932, and remained there until November 19, 1932, before any lock was placed on the door of the vault.

There is no evidence of any suspicious circumstances tending to show that the election returns had been tampered with by any one after they were placed in the basement vault.

The record does show, however, that any person in the courthouse, at any time during the ten days between November 9th and 19th, had easy access to the sacks in the vault.

While some of the county employees testified that they saw no tampering of the ballots by others, the testimony of many other county officials and employees was not produced.

The lower court refused to consider the returns of the election board contest, and held the recount inadmissible, because the evidence failed to show that there was no reasonable opportunity or possibility of tampering with the ballots by unauthorized persons, and because the county auditor failed to carefully preserve the ballots, as required by law.

It is the settled rule in this state that the burden of proof rests upon the contestant to show that the ballots have been properly preserved by the county auditor in such a manner as to reasonably preclude the opportunity of their being tampered with by unauthorized persons: that they have not been exposed to the public; and that no opportunity for tampering with them had been given others. Cooley on Constitutional Limitations, 625; McCrary on Elections (4th Ed.) par. 471; 20 C. J. 255; Davenport v. Olerich, 104 Iowa 194, 73. N. W. 603; Mentzer v. Davis, 109 Iowa 528, 80 N. W. 557; DeLong v. Brown, 113 Iowa 370, 85 N. W. 624; Donlan v. Cooke, 212 Iowa 771, 237 N. W. 496; West v. Sloan, 238 Ill. 330, 87 N. E. 323; Graham v. Peters, 248 Ill. 50, 93 N. E. 315; Dennison v. Astle, 281 Ill. 441, 117 N. E. 1004.

Although the evidence as introduced might not show any suspicious circumstance tending to show that the ballots were actually tampered with, it does show without dispute that they were not carefully preserved by the county auditor as required by law. In fact, it appears that the ballots, from November 9th to November 19th, were as much in the possession of any other county official as in the possession of the auditor. Access to the ballots was just as easy to the other county officials, and to any one frequenting the courthouse during those ten days, as it was to the county auditor. Under such a condition it can hardly be held that the ballots were being carefully preserved by the county auditor.

In the cases holding the ballots themselves competent evidence, it invariably appears that such ballots, between the time of the election and the contest, were substantially at all times under the control of the county auditor. Furguson v. Henry, 95 Iowa 439, 64 N. W. 292; Donlan v. Cooke, 212 Iowa 771, 237 N. W. 496.

In the case of DeLong v. Brown, 113 Iowa 370, 85 N. W. 624, the auditor's office had a first floor and basement vault connected with each other in his office. There was a window in the basement vault but only one entrance over a spiral staircase from the auditor's office. The ballots in that case were kept in the lower vault, until

the trial before the contest board. In that case a number of people had access to the lower vault without any particular surveillance on the part of the county auditor. While the auditor accompanied most of the people who went into the vault, others went in without him. There were also short periods of time when both the auditor and his deputy were absent while the office was open. We there said:

"From this evidence it may well be said that the ballots were not beyond the reach of any one who might have had access to the vaults, and were not so placed or guarded as that any interference therewith would have been at all likely to be detected. The ballots in two of the envelopes, at least, might have been changed without disturbing the seals, and the seals of others were not so stamped as to obviate opening and resealing without detection. In such a case it cannot be expected that any actual interference will be shown, nor that testimony of those having the opportunity to meddle therewith, and denying having done so, will be refuted. The effectiveness of the tampering necessarily depends on the secrecy with which it is done, and ordinarily the ballots themselves alone bear witness to the facts. The memory of election judges will hardly retain knowledge of the markings of the ballots when counted. *So that in the very nature of things perfect safety may be attained only by placing them beyond the reach of unauthorized persons.* This could have been done with slight trouble and little expense, or the auditor might have accompanied all who entered the vaults, and fastened the window. As said in the Davenport case, 'the duty of preserving them is not a negative one of noninterference, but a positive requirement to do whatever may be necessary in order to accomplish the purposes of the law in keeping them inviolate.' Perfection, however, is only aimed at, not required, in this world, and all necessary is that the ballots 'shall not be so exposed to the reach of unauthorized persons as to afford a reasonable possibility of their having been tampered with.' * * * It is evident from his testimony that the auditor allowed any one in the vaults in whom he reposed confidence. Were it certain that such confidence might never be betrayed, there would be little difficulty in this class of cases. We have, at best, only his opinion that others than those named were not in the vaults alone."

The court there held that:

"No precaution whatever was taken with respect to the protec-

tion of the ballots, save in throwing the envelopes in the vaults; otherwise, the affairs of the office were conducted the same as at any other time. That there was a reasonable possibility of their having been tampered with is put beyond question by this record. It depended wholly on the motive of evilly disposed persons in the community. *Ballots so negligently preserved ought to be given no consideration whatever, and should have been rejected.*" (Italics ours.)

In Davenport v. Olerich, 104 Iowa 194, 73 N. W. 603, we said:

" 'Before the ballots should be allowed in evidence to overturn the official count and return, it should appear affirmatively that they have been safely kept by the proper custodian of the law; *that they have not been exposed to the public, or handled by unauthorized persons; and that no opportunity has been given for tampering with them.*' * * * onus is on him who would discredit the official count, before resorting to the ballots as the best evidence of who has been elected, *to show that these have been preserved with that care which precludes the suspicion of having been tampered with and the opportunity of alteration or change.*" (Italics ours.)

In Mentzer v. Davis, 109 Iowa 528, loc. cit. 531, 80 N. W. 557, we said:

"Of course, this does not mean that they must be proven genuine beyond all suspicion, however groundless, nor that there is no possibility that they might have been tampered with. To adopt such a rule would be to exclude the ballots entirely; for we can hardly imagine a case where they might not be tampered with. No safe is so secure as that it may not be unlocked, and no vault so perfect that it may not be entered. *What is meant is that they shall not be so exposed to the reach of unauthorized persons as to afford a reasonable possibility of their having been changed or tampered with.*" (Italics ours.)

In Dennison v. Astle, 281 Ill. 441, 117 N. E. 1004, the court recognized this rule in the following language:

"It was not incumbent upon appellee to show that the ballots had been tampered with, but it was incumbent upon the appellant to show clearly that the ballots had been kept intact in the same condition as when counted *and preserved without opportunity of interference with them.*" (Italics ours.)

. The facts in that case were very similar to those in the case at bar. The ballots here have not been shown to be of sufficient integrity to warrant their introduction in evidence. There was practically no surveillance of the ballots in question for the ten days and nights between the 9th and the 19th of November, 1932. The vault in the lower basement was entirely disconnected from the auditor's office. Access to the basement vault was just as easy to an outsider as it was to the auditor himself. He might almost as well have piled the sacks in a woodshed.

Section 851 of the Code provides that the auditor "shall carefully preserve them [the ballots] for six months." Under this statute-as construed by our court, the integrity of the ballots must be protected from any reasonable possibility of their being tampered with. While we have held that it need not be shown there was no possibility that they might have been tampered with, we have also said that:

"What is meant is that they shall not be so exposed to the reach of unauthorized persons as to afford a reasonable possibility of their having been changed or tampered with." Donlan v. Cooke, 212 Iowa 771, 237 N. W. 496, 497.

While we realize that the former stringent rule on this question has been somewhat relaxed, it will be noticed that in practically all of such cases the evidence reasonably shows that the ballots were under the control of the auditor. The rule still requires that after the ballots have been returned to the auditor, they shall not be so exposed to the reach of unauthorized persons as to afford a reasonable possibility of their having been changed or tampered with. In the case at bar the ballots deposited in the basement vault were so exposed to the reach of unauthorized persons as to afford a reasonable possibility and opportunity of their being changed or tampered with. For ten days they were practically subject to the inspection of all county employees or any one else frequenting the courthouse. Although the auditor gave his "opinion" that the bags were in the same condition as when first placed in the vault, such testimony was necessarily only a conclusion, as he also said that they might have been changed. It was impossible for him to testify with any reasonable degree of certainty that they were in the same condition, because they were not under the exclusive control of his office during that time. The ballots may not have been tampered

with, but that fact was not sufficiently established. The integrity of the ballots could not be preserved by allowing them to be placed within the easy reach of unauthorized persons for a period of ten days. The burden in this class of cases rests upon the contestant to show that there was no reasonable possibility of tampering by unauthorized persons. The contestant failed to meet this burden and the undisputed evidence shows that during those ten days any outsider had easy access thereto. They were no more in the possession of the county auditor during that time than that of the county engineer, the highway commissioner, the janitor, or any other county official. They were easily accessible to all such county officials and also to outsiders frequenting the courthouse. The integrity of the ballots cannot be jeopardized by allowing them to be within easy access to others for the length of time shown in this record.

If the ballots had been under the exclusive surveillance or control of the county auditor during those ten days and the evidence was the same as that offered, it would have been sufficient, in connection with such control, to establish the contestant's election. For lack of such control it cannot be said that there was no reasonable opportunity for outsiders to tamper with the ballots or that they were not in fact tampered with. By the simple act of providing a lock and key for the vault door, the auditor would have eliminated any question of the integrity of the ballots.

It is our conclusion that the contestant has failed to show that the ballots were carefully preserved by the county auditor as required by law.

For the foregoing reasons we believe the official returns declaring the incumbent elected is not overcome by the evidence offered in this case.

The finding of the lower court in so holding was correct, and the judgment is hereby affirmed.

All Justices concur.