In re Election Contest of Harry Stamos, Appellee, v. Joe Gray, Appellant.

No. 43246.

February 13, 1936.

T. G. Fee, and Jones & White, for appellant.

E. P. Powers, and T. A. Goodson, for appellee.

ALBERT, J.—At the November election in 1934, there were three candidates for a membership on the board of supervisors of Appanoose county: Harry Stamos, Joe Gray, and Harry Stickler. The official canvassing board determined that Gray had a majority of 15 votes over Stamos, and that Stickler had fewer votes than either Stamos or Gray. In due time and form, Stamos instituted a contest against Gray. This contest in due time came on for hearing in the form and manner provided by law, and the contest board made a finding in which, among other things, it found that Stamos had a majority of 54 votes over Gray; but the board held in favor of Gray because "the contestant had offered no evidence in the contest court to show proper preservation of the ballots," and therefore the board held in favor of Gray. Stamos then appealed to the district court, and when this appeal was tried out a stipulation was made between the parties as follows:

"* * * that if the ballots cast in the General Election, November 6th, 1934, are counted now they will show that there are fifty-four (54) more ballots for the contestant, Harry Stamos, than for the incumbent, Joe Gray, and the court may so find. It is expressly agreed that nothing herein shall be in any manner construed to be a waiver on the part of the incumbent of his right to object to the admissibility of said ballots, or of his right to question the probative value thereof, if admissible. It is expressly agreed that nothing herein shall be in any manner construed to be a waiver on the part of the contestant to offer any evidence as he may see fit to offer, on any subject, subject however, to such objection as the incumbent may see fit to make."

The district court after trial held that Stamos had 54 more votes than Gray, and that the ballots had been properly preserved, and awarded the office to Stamos. Gray appeals.

It will be noticed, therefore, that so far as this appeal is concerned, there are only two questions presented: First, whether the ballots were properly preserved; and, second, if so, the probative value of the ballots.

There are some fundamentals controlling the questions in-

volved that have been fully disposed of in this state. First, the burden of proof is upon the contestant to show the proper preservation of the ballots. Davenport v. Olerich, 104 Iowa 194, 73 N. W. 603; Doak v. Briggs, 139 Iowa 520, 116 N. W. 114; Matzdorff v. Thompson, 217 Iowa 961, 251 N. W. 867. Second, the official canvass is controlling except when the ballots themselves are admissible in evidence to overthrow the same. De Long v. Brown, 113 Iowa 370, 85 N. W. 624; Brown v. Crosson, 115 Iowa 256, 88 N. W. 366.

If the ballots have not been properly preserved they are not admissible in the contest court, nor in the district court. We have pronounced this rule so often in numerous cases that it is necessary only to refer to the first case, Furguson v. Henry, 95 Iowa 439, 64 N. W. 292, and to the last case, Traeger v. Meskel, 217 Iowa 970, 252 N. W. 108, where our previous cases on this proposition are cited.

We also laid down the rule in the case of Tyler v. Klaver, 220 Iowa 1124, 264 N. W. 37, that the presumption is that where the ballots come through the proper channel, and from the custodians provided by law for their keeping, such ballots are prima facie evidence. This may be met with proof that they are not as they were cast and counted. In other words, when these ballots are found in the hands of the county auditor, in the absence of any showing to the contrary, they are *prima facie* evidence as to all matters occurring prior to their delivery to such officer.

This case is an equity case and triable *de novo* in this court. Murphy v. Lentz, 131 Iowa 328, 108 N. W. 530 (overruling Spurrier v. McLennan, 115 Iowa 461, 88 N. W. 1062).

In regard to the rule as to caring for and preserving the ballots, we said in Mentzer v. Davis, 109 Iowa 528, 531, 80 N. W. 557, 558:

"Of course, this does not mean that they must be proven genuine beyond all suspicion, however groundless, nor that there is no possibility that they might have been tampered with. * * * What is meant is that they shall not be so exposed to the reach of unauthorized persons as to afford a reasonable possibility of their having been changed or tampered with."

In Marsh v. Huffman, 199 Iowa 788, 796, 202 N. W. 581, 585, on this proposition we said: "While we have said that it must affirmatively appear that the ballots had been preserved with that

jealous care which precludes the opportunity of their being tampered with * * * yet we have also said that they need not be so shown beyond groundless suspicion, nor that there is no possibility that they might have been tampered with.''

The rule laid down in these cases has been consistently followed to and including the above-cited case of Tyler v. Klaver.

With these rules in mind we turn to the record in this case. It is impossible, of course, to set out the exhaustive record and testimony in the case. We can only summarize its contents.

■■■ Shortly after the receipt of these ballots by the county auditor, in their boxes, they were stored in a vault in the basement of the courthouse. The basement of the courthouse could be reached only through a single door in one of the rooms immediately above the same, and there were no windows in the basement. What is designated in the record as the vault is in the northwest corner of the basement. The outer wall was part of the foundation wall of the courthouse, and the inner walls were constructed of hollow tile. It had a cement floor. There were no windows in the storeroom or vault, and the only entrance was one door. It was lighted by electricity.

The real contention of the parties here is over the door to this vault. It was constructed of two-inch white pine, commonly known as boxcar siding. It was of double thickness, of new lumber; the boards on the outside were perpendicular, and those on the inside were placed diagonally. The two thicknesses were fastened together with screws. On one side of the door were two strap hinges, connecting the door with the jamb. On the other side of the door was a Yale lock with a spring catch, which was the only means of locking or fastening the door. The door was made of new lumber, and there was a crack between the door and the frame of between three-sixteenths and one-fourth inch. When the door was hung it was held closed by a bolt in the lock, which, when turned, entered into a hasp or keeper so as to hold the door shut. The keys to this lock were kept in the safe in the auditor's office. The auditor testifies that he frequently was in the basement and looked to see as to the safety of these ballots, and that on the 7th of January, 1935, this door was in good condition so far as the lock was concerned. On the next day he was again in the basement and went down to this storeroom and unlocked the door, and when he went to push the door shut it would not lock. In order to get the door locked on that date, it was

necessary to put an iron bar under the door and lift up on it, and after it was so lifted it would lock. It was locked on that morning when he went down, and when he opened the door it would not shut (lock). On January 9, 1935, he caused an additional lock to be placed on the door and had the stove bolts which fastened the hinges battered or marred on the inside of the door, and caused the heads of the stove bolts to be ground off so as to face the slot in the bolt pin. The keys to the extra padlock put on the door at that time were kept in the combination safe in the auditor's office.

Much testimony is introduced as to just how this door operated before the padlock was put on, and great stress is laid by the contestant on the security of this door. It is claimed that the difficulty with the door arose from the fact that the door had been pried down from the top, thus lowering the bolt in the lock so that it would not connect with the hasp on the jamb of the door. The evidence in this respect is not very satisfactory, and on top of it, the district judge who tried the case, on two different occasions, inspected the condition of the door and found that there was no indication that it had been pried down from the top. As is usual with doors of this character, it is very probable that the door, in shrinking, naturally settled enough to drop the bolt below the hasp, thus preventing the locking of the door. We have reread this record with much care, and are satisfied that, in so far as this phase of the question is concerned, these ballots were properly taken care of within the rules we have laid down, and we therefore hold that the same were admissible in evidence.

The next question discussed is the probative value of the ballots after they were admitted. Numerous complaints are made in relation thereto. Complaint is made that in certain instances there were more ballots returned than were sent out by the county auditor, considering those that were used and those that were unused and returned to the auditor; and that in other instances there were fewer. We do not think this is a material matter in this case. The question is, How many ballots were used, counted, and returned to the auditor's office? This is the material question in this phase of the case. Testimony is also introduced on this question in that certain judges of the election testified that they folded the ballots and put them in an envelope, and then inclosed the same in a sack and put it in the metal box

which they returned to the county auditor. Some judges, however, testified that they did not use the envelope referred to; and the auditor does not recall that in any of the 30 precinct boxes there was an envelope used to inclose the ballots before they were put into the sack. It is argued, therefore, that if as a matter of fact the ballots were placed in an envelope before putting them in the sack, and when they reached the auditor's office they were not inclosed in an envelope, this shows that the ballots had been tampered with. We do not think this proposition has much merit, or that it is sufficient to warrant us in holding that the probative value of the ballots was destroyed.

██ Complaint is also made of the fact that some of the ballots did not have the imprint of the township seal on the wax which was placed upon the wires or strings which tied the ballots together. We have held that on matters of this kind the statute (Code 1935, section 851) is merely directory. Sec, Marsh v. Huffman, 199 Iowa 788, 202 N. W. 581; Murphy v. Lentz, 131 Iowa 328, 108 N. W. 530.

A careful reading of the record satisfies us that these ballots were properly preserved, have full probative value, and that the district court's ruling was right.—Affirmed.

DONEGAN, C. J., and RICHARDS, PARSONS, KINTZINGER, and ANDERSON, JJ. concur.