# J. CLAYTON ROCHE AND ANOTHER v. CITY OF MINNEAPOLIS.[1]

March 21, 1947.

No. 34,243.

*Thomson & Williams*, for appellants.

*R. S. Wiggin*, City Attorney, and *John T. O'Donnell*, Assistant City Attorney, for respondent.

[1]Reported in 27 N. W. (2d) 295.

MAGNEY, JUSTICE.

Plaintiffs recovered a verdict of $850 against defendant, the city of Minneapolis, in an action in which they claimed that water seeping through the floor of their basement damaged their property, caused, as they asserted, by the negligence of the city. The court on motion set aside the verdict and ordered judgment for defendant. The appeal is from the judgment entered on the order.

In 1935, plaintiffs built a home on York avenue between Forty-first and Forty-second streets in Minneapolis. It was damaged on May 29 and 30, 1942, by water seeping into the basement from underneath the floor. No water came through the walls. From 1935 until 1942, they suffered no such inconvenience or damage from water. When the house was built, the sidewalk, curb, and sanitary and storm sewers were all in and the street improved.

Between plaintiffs' home and Forty-first street are four lots, the lowest point in the district. All adjoining streets run down toward Forty-first and York. Plaintiffs claim that water gathered on these lots, formed a pond, infiltrated through the soil, and entered their home from underneath.

Originally the whole area was a marsh, most of it a peat bog, extending about two miles, with a natural drainage into Lake Calhoun. The lake is about 3,000 feet from plaintiffs' property.

In 1898, a topographical survey of the whole marsh area, including the present York avenue district, was made for the park board. Soundings were taken and test pits sunk, and the depth of the peat deposit was ascertained, as well as the nature of the material underneath the peat. The swamp was what is commonly called a floating peat bog, with a current of water underneath the peat. One of the crew making this topographical survey, in stepping from hummock to hummock of peat, missed his footing and disappeared into a hole, and although a large excavation was made his body could not be found.

In 1918 several test pits were sunk. At Forty-first street, either at York or Xerxes a block away, they found 6 feet of peat, 3 feet of quicksand, and 13 feet of sand and gravel above a hard bottom. The

water in the hole came up to within 2 feet of the surface. The elevation at the top of that hole was 153.8 feet above city datum. The elevation of the water was 151.8.

At the same time, a test pit was sunk near York and Forty-second street, less than a block south of plaintiffs' home. The elevation was 154 city datum. The engineers found 4.5 feet of peat, 1.5 feet of clay, and 14 feet of sand and gravel. The water in the hole came up to within 2 feet of the surface. Plaintiffs' property lies practically between these two test pits. Plaintiffs' lot is a sand point sticking out into the marsh. The elevation of the lot is 154.9 feet on its north side at York avenue and 154.6 feet on its south side. The elevation at the corner of York and Forty-second street is 153.3 feet and at the corner of York and Forty-first street, 153. Thus, plaintiffs' lot is not over a foot and a half above the lots at the end of their block. It has a peat bog on three sides of it. It can hardly be described as a "high nose of ground" or "top of the ridge," as plaintiffs' chief witness describes it. The original official profile map shows that the whole area is practically level country. The corner of Forty-second and York is at an elevation of 153.3 feet city datum; the corner of Forty-first and York is 153; the corner of Fortieth and York, 154.4; and the corner of Thirty-ninth and York, 152. The Geologic Atlas of the United States issued in 1916 shows the area as one big swamp. There is no dispute as to this fact. Adolph F. Meyer, plaintiffs' expert, was asked:

"Q. Do you know that that entire territory was one great big swamp and lake?

"A. It is so shown on the 1916 survey as a swamp, and not as a lake.

"Q. It was a swamp from your plats here in 1916?

"A. It was low ground, but not Mr. Roche's property.

"Q. I mean around in Mr. Roche's district there.

"A. In that district there was a swamp area, * * *."

There can be no dispute that this area was a natural surface-water depository. The contour lines on the official plats show this. Plain-

tiffs' testimony and that of their chief witness is to the effect that the corner of Forty-first street and York is about the lowest point in the area and that all adjoining streets slope to that corner.

Plaintiffs' expert witness claimed that the city interfered with "a natural watercourse" or "a natural drainage course" by building its streets across a "natural channel" and causing the damages complained of. The official topographical maps and the other maps received in evidence clearly show that no "natural watercourse" or "natural channel" existed and therefore could not be blocked, and that the whole area was a natural water depository. No water was introduced onto plaintiffs' premises that originally did not belong there.

In 1924, the city constructed a storm sewer to help drain this area. It was repaired in 1934. The drainage district covered 370 acres. One of the branches of the sewer pipe, 42 inches in diameter, was laid in York avenue, passing plaintiffs' property. As it approached Lake Calhoun, the outlet, it was 48 inches in diameter. The storm sewer is constructed of 4-foot sections of pipe. The joints are not tight, so that the sewer takes in surface water.

In November 1942, lot 4, next to plaintiffs' lot, was test-pitted. The surface of the ground was 153.8, and the water stood at 148. Thus, the water then stood at 5.8 feet below the surface. In a test pit near Forty-first and York, made at the same time, the surface of the ground was 151.6 feet above city datum, and the water stood at 147.63, four feet below the surface. The surface of the floor in plaintiffs' basement is at an elevation of 149.1. Elevation of the bottom of the storm sewer at a manhole 50 feet north of plaintiffs' lot is 147.1. Thus the basement floor is below the top of the sewer when the sewer is running full of water. Plaintiffs' basement is little more than 6 feet above the level of Lake Calhoun.

It is obvious that the water level in this area has been lowered. It seems reasonable that the presence of the storm sewer accounts for such lowering. Without this storm sewer it is not conceivable how the former swamp surface could be used for building sites. The whole of this large swamp or bog area was the depository of

the surface water from surrounding country, and this water eventually found its way to Lake Calhoun. The area originally had no natural watercourse, unless the swamp or bog could be called such. This court in St. Paul & D. R. Co. v. City of Duluth, 56 Minn. 494, 500, 58 N. W. 159, 160, 23 L. R. A. 88, 45 A. S. R. 491, a case dealing with a swamp situation such as here, said:

"The cases cited by counsel are cases where surface water was collected and discharged onto premises where it would not naturally go. The city of Duluth would have no right to discharge surface water on the land of any private owner, unless his land is the natural channel or dumping ground for it. But the land of plaintiff is such natural dumping ground. Plaintiff complains that the city is making such of it, but it seems to forget that nature, and not the city, has made this place such dumping ground, and that the city has never relieved the land of such servitude."

The court asked (56 Minn. 501, 58 N. W. 160, 23 L. R. A. 88, 45 A. S. R. 491):

"* * * Can the owner of a swamp improve it, and then compel the owner of the high land around it to keep the surface water naturally tributary to the swamp from coming from the higher lands upon the swamp?" and answered its own question: "We think not."

Here, the city has actually constructed a sewer to relieve the swamp area from the effect of the surface water naturally tributary to the swamp. As has been shown, the water level has been lowered from 2 feet below the surface to more than 5 feet. That it has effectively relieved the water situation is further evidenced by the fact that from the time of its construction in 1924 until 1942 no complaint was received by the city as to its sufficiency. When complaint was made on May 29, 1942, the sewer department received on the same day 95 or 97 other complaints of flooding sewers.

Dudley v. Village of Buffalo, 73 Minn. 347, 76 N. W. 44, is very similar to the instant case. Space forbids detailed recital of the facts. There, the village constructed streets on all four sides of a block of which plaintiff owned the north two-thirds and installed

certain drains. The court held that a village is not liable for the overflow onto private property resulting from the inadequacy of its drains constructed for the purpose of carrying off surface water from its streets where such property is the natural depository of all the water discharged thereon. The court further held that the evidence did not show that the village, by its drains or otherwise, unnecessarily discharged surface water upon the plaintiff's land where it did not naturally belong. The court said (73 Minn. 350, 76 N. W. 45):

"* * * The plaintiff admits, as he must in view of the undisputed evidence, that if the village had not improved its streets and constructed the drains in question, all of the surface water complained of would have flowed upon his park; * * *.

"It is clear then," the court said, "that the village is not liable for putting in the upper drain, and thereby carrying the water across the street [to plaintiff's premises], because it did not gather the surface water and unnecessarily discharge it in a stream upon the plaintiff's premises where it did not naturally belong. The park was the natural place of deposit of this surface water. In this particular this case is radically different from that of Robbins v. Village of Willmar, 71 Minn. 403, 73 N. W. 1097, relied upon by the plaintiff.

"The improvement of the streets and the putting in of these drains by the village was a direct benefit to the plaintiff's premises, as they relieved them in a large part of the surface water naturally flowing upon them; and, if the defendant is liable at all in this case, it must be because it did not do more, and wholly relieve the premises at all times from the burden of surface water naturally resting thereon, by making its drains of sufficient capacity to secure such result. The law imposed no such liability upon the village." (Citing cases.)

As stated, plaintiffs' premises in the instant case were part of a large swamp which was the natural depository of surface water from a large area. The peat bog was saturated with water. The improvements made by the city have lowered the water level to such an extent that the surface of a large part of the swamp has become

usable for residential purposes. The only complaint plaintiffs can make is that the municipality did not do more and wholly relieve the premises of surface and infiltrated water.

In a somewhat similar case, Nichols v. Village of Morristown, 195 Minn. 621, 623, 263 N. W. 900, this court said: "The trouble with plaintiff is that he acquired property consisting of low and flat land." See, also, Nichols v. Village of Morristown, 192 Minn. 510, 257 N. W. 82.

In 26 Minn. L. Rev. 634, the writer states:

"Regardless of the rule the court purports to follow, it would probably arrive at the conclusion, as it has done, that if the municipality in its work of improving its streets or public places interferes with the natural flowage of surface water or fails to take care of it, it is not liable if the possessor of lower land is no worse off than before. In such a case it need not put in any sewerage system at all, or one adequate to take care of all the water." (Citing cases.)

This is not a case where a municipality in grading its streets blocks the natural channel of surface water in such a way as to gather up such waters in a body and cast them in large and injurious quantities upon the property of others where they did not previously flow. Here, there was no natural channel for surface water. It was originally a large floating bog—a natural depository and not a channel. The city did not cast upon plaintiffs' property quantities of water in excess of what had been previously there; in fact, it had so greatly relieved the area of its former water burden as to make it available for use.

■ The duty rests upon a municipality to employ competent engineers to plan and construct its system of streets and sewers, and ordinarily, if it thus acts, it is not liable because of errors of judgment therein. Pye v. City of Mankato, 36 Minn. 373, 31 N. W. 863, 1 A. S. R. 671; McClure v. City of Red Wing, 28 Minn. 186, 9 N. W. 767; Taubert v. City of St. Paul, 68 Minn. 519, 71 N. W. 664. In the instant case, no one questions the competency of the engineers who

planned and constructed the municipal improvements, the efficiency of which is here questioned.

Complaint, however, is made that the storm sewer enters Lake Calhoun through a submerged outlet. The city engineers give two reasons for this kind of construction. One is the aesthetic reason, since Lake Calhoun is part of the park system of Minneapolis; and the other is the lack of sufficient grade through the area drained. Wherever feasible, an above-water surface outlet is preferred. Plaintiffs' expert claims that the submerged outlet retards the flow and lessens the amount of water which may be discharged. He also calls attention to the sand bar which forms in front of the outlet and which he claims blocks the sewer. Of course, during the winter season, when no water comes through the storm sewer, sand accumulates. But apparently during rainfall the sand is washed away so as to permit adequate flowage. The velocity makes it self-cleaning. To substantiate this, in all the years since the sewer was built until May 29, 1942, no complaint about this sewer was made to the city sewer department. Furthermore, there are two manholes in this sewer in the park between Thirty-eighth street and the lake, one on each side of the boulevard. If the outlet should become plugged so as to raise the water in the sewer three feet, the covers of these two manholes would be blown off. Robert A. Huston, assistant city sewer engineer for 15 or 16 years and sewer engineer for 14 years, testified that during all that period he had never heard of these manhole covers blowing off or that he had ever seen any evidence of it. Plaintiffs' damages, it seems, cannot be accounted for by reason of the submerged outlet. There is a drop in the storm sewer from a point opposite plaintiffs' house to the normal level of Lake Calhoun of 4 feet. That does not provide for much fall. To the same extent that the outlet of the sewer would be raised above the level of the lake the fall would be lessened.

There was a heavy rainfall on May 29 and 30, 1942. At the downtown gauge it registered 7.07 inches and at the airport 2.93 inches. This excessive rainfall was caused by a thunderstorm, and the distribution of the amount of rainfall was uneven. Plaintiffs' property

is substantially halfway between these points. Just how much fell in the vicinity of plaintiffs' premises cannot be stated. Practically 2 inches fell on May 25. The rainfall for the month was 6.78 inches at the airport and 10.92 inches in the loop district. At the St. Paul airport it showed 11.29 inches for May. It was the heaviest rainfall in St. Paul and Minneapolis during the month of May for over a century. Records of rainfall began at Fort Snelling in 1837. It is fair to assume that at the beginning of the month of May the ground was pretty well saturated from the spring thaws. The peat bog surrounding plaintiffs' lot was unable to absorb the excessive moisture.

No complaint is made that the storm sewer in question did not have proper inlets. In fact, at the intersection of Forty-first street and York avenue, near plaintiffs' premises, there were 12 such.

■ In view of the whole situation, we can see no actionable negligence on the part of the city and are of the opinion that the trial court was right in granting judgment notwithstanding the verdict.

Judgment affirmed.

THOMAS GALLAGHER, JUSTICE (dissenting).

I am unable to concur in the majority viewpoint. In my opinion, the recitation of facts therein ignores conflicting evidence submitted by plaintiffs, received by the court, and considered by the jury. I refer particularly to the statements in the majority opinion that plaintiffs' lot and the four adjoining lots to the north thereof comprised the lowest point in the area; that there was no evidence to establish the existence of a natural or artificial channel of surface waters or to indicate that defendant had blocked such a channel, stopped the flow of such waters, gathered them up, and cast them in injurious quantities on plaintiffs' property; and that there was no evidence to establish that water was introduced onto plaintiffs' premises that did not originally belong there. Such statements ignore completely the testimony of Adolph F. Meyer, an expert on the subject of water drainage, who testified at length on behalf of plaintiffs and whose testimony was for the most part undisputed.

After an extensive foundation establishing his familiarity with the district and with the premises belonging to plaintiffs, his ex-

perience and study of water flowage generally, and in particular with reference to this district and plaintiffs' property there, Meyer testified in substance as follows:

That he first inspected plaintiffs' property and the surrounding area on June 28, 1942, after a heavy rainstorm on that day; that he then found a large pool had formed at the corner of Forty-first and York because the York avenue drain was not taking off the surface waters at this point; that such waters were overflowing the sidewalk and curb there, which had been permitted to sink below the street level, onto the vacant lots north of plaintiffs' premises; that observations and tests made by him indicated that such waters thereafter settled into the ground, raised the underground water level, moved southward, and forced their way up through plaintiffs' basement floor.

That the natural flow of water in this area is from the high ground west of York easterly down to York and thence north to Lake Calhoun; that Fortieth and Forty-first streets and York avenue constitute dams across the natural water channels from five to seven feet in height; that a 1916 survey submitted in evidence indicates that a culvert existed on York avenue through Fortieth street to aid in carrying off such surface waters, but that it had been eliminated at the time of his inspection of this area; that the surface waters cannot get into the intakes of the drain sewers on York avenue because the streets are substantially higher than the surrounding ground; that in consequence such waters become trapped at Forty-first and York and overflow onto the vacant lots north of plaintiffs' house.

That the drainage of surface waters here is further retarded because the Thirty-eighth street drain carrying off waters from much higher ground to the west brings such waters into the York avenue drain at Thirty-eighth and York with sufficient force to block the flow in the York avenue drain and to cause the water therein to back up and stop the drainage of surface waters at street intersections south thereof, particularly at Forty-first and York.

That such drainage is further retarded because the present outlet of the York avenue drain in Lake Calhoun is below the lake surface and hence is bound to become clogged with sand and mud to an extent sufficient to retard drainage therefrom; that such outlet was examined by him on two subsequent occasions, once in the winter, when he found only three and one-half inches of the 48-inch outlet open, and once in the summer, when only one and one-half to two feet of said outlet remained clear.

That because of the conditions outlined there is no way for the surface waters which follow ordinary heavy rainstorms such as occurred on May 29, 1942, to drain off from the area except by seeping and filtering into the ground.

That the lowest point and natural depository for surface waters in this area is not at the corner of Forty-first and York, but some distance east thereof; and that the street and drainage system constructed by defendant, rather than the level of the area, occasioned the gathering up and depositing of the surface waters on the premises adjacent to plaintiffs' house.

Meyer further testified that defendant should have provided adequate drainage by (1) maintaining the original natural surface-water channels through the installation of adequate culverts under the streets; (2) by providing a direct and separate outlet for the Thirty-eighth street drain; (3) by constructing the outlet for the York avenue drain at lake-surface level instead of below the surface; (4) by maintaining the curbs and sidewalks so as to prevent their sinking below the level of the streets; and (5) by maintaining the original level of the York avenue drain as it extended into Lake Calhoun.

The trial court set aside the verdicts because, as stated in its memorandum (1) the evidence clearly indicated that the May 29 storm was an excessive and severe one, breaking all records for the past 50 years; and because (2) there was no evidence that the waters overflowed the catch basins and manholes on York avenue; and in consequence the conclusion was inescapable that plaintiffs'

damage was caused by the unusual and heavy rainstorm rather than defendant's negligence. I am convinced that both these questions were for the jury.

As to whether the May 29, 1942, rainfall was excessive or otherwise, the testimony concerning it is in conflict. Mr. Meyer submitted evidence from his records indicating that once in 10 years rain falls in Minneapolis at the rate of 2 inches in one hour; once in 25 years at the rate of 2.4 inches in one hour; that on May 29, 1942, the rainfall was less than one inch in an hour and only 2.63 inches in 24 hours (although the downtown station showed 3.59 inches in 24 hours); that this was not an unusually, but only an ordinarily, heavy rain; that the peat soil north of plaintiffs' home would have absorbed this rain had not the waters from the surrounding streets backed up thereon, as previously described.

Government records submitted by defendant established that in May 1942 the total rainfall for the month was 6.78 inches, although the loop station indicated 10.92 inches for such month. Defendant's exhibit W, a government record, indicated that in July 1892 in Minneapolis 11.87 inches of rain fell; in June 1897, 9 inches; in May 1906, 10.33 inches; in June 1911, 6.93 inches; in October 1911, 6.42 inches; in August 1924, 7.35 inches; in May 1938, 6.97 inches; and, as previously stated, in May 1942, 6.78 (or 10.92) inches.

Mr. Martin Hovde, meteorologist in charge of the Minneapolis weather bureau, testified that the rainfall on plaintiffs' residence on May 29, 1942, had been exceeded many times in the history of the bureau for the 24-hour period, and that there were no short periods of excessive rainfall during that storm.

As to whether there was evidence that the waters overflowed the catch basins and manholes on York avenue, the second point raised by the trial court, both Meyer and plaintiff J. Clayton Roche testified in substance that the pool was formed on the vacant lots north of plaintiffs' property because the York avenue drain did not take away the surface waters after the storm, and in consequence that such waters were gathered up at the intersection of Forty-first and York, overflowed the sunken curb and sidewalk there, formed the

pool described, and continued to break into plaintiffs' basement for several weeks following the May 29 storm.

1. It would seem that the evidence outlined, which for present purposes must be accepted as true, is ample to require submission to the jury of several important issues, including the two withdrawn by the trial court after verdict; and, further, that a jury's finding in favor of plaintiffs thereon would be amply sustained by the evidence referred to.

2. Several legal principles applicable here are well established in this state. We have held that a municipality has a right to open and grade streets, even to the extent of interfering with the natural flow of surface waters, without liability for incidental damage caused thereby. Lee v. City of Minneapolis, 22 Minn. 13; Alden v. City of Minneapolis, 24 Minn. 254; Henderson v. City of Minneapolis, 32 Minn. 319, 20 N. W. 322; Pye v. City of Mankato, 36 Minn. 373, 31 N. W. 863, 1 A. S. R. 671; Tate v. City of St. Paul, 56 Minn. 527, 58 N. W. 158; Schuett v. City of Stillwater, 80 Minn. 287, 83 N. W. 180. It is equally well established, however, that a municipality may not, in grading its streets, block the natural channel of surface waters in such a way as to gather up such waters in a body and cast them in large and injurious quantities *upon the property of others where they did not previously flow.* O'Brien v. City of St. Paul, 18 Minn. 163 (176) ; Brown v. Winona & S. W. Ry. Co. 53 Minn. 259, 55 N. W. 123, 39 A. S. R. 603. The duty rests upon a municipality to employ competent engineers to plan and supervise the construction of its system of streets and drainage disposal, and, ordinarily, if it thus acts it is not liable because of errors of judgment therein. Pye v. City of Mankato, *supra;* McClure v. City of Red Wing, 28 Minn. 186, 9 N. W. 767; Taubert v. City of St. Paul, 68 Minn. 519, 71 N. W. 664. This does not mean, however, that the employment of competent engineers for such purposes relieves the municipality from liability if the system designed and installed results in a trespass upon the lands of another, such as the gathering and casting of large and injurious quantities of surface waters thereon. Tate v. City of St. Paul and Schuett v. City of Stillwater,

*supra;* Robbins v. Village of Willmar, 71 Minn. 403, 73 N. W. 1097; Boye v. City of Albert Lea, 74 Minn. 230, 76 N. W. 1131; Weber v. City of Minneapolis, 132 Minn. 170, 156 N. W. 287.

It is equally well settled that a municipality is not liable for damages caused by an overflow of its drainage system resulting from *extraordinary rains or floods* unless its negligence in failing to properly keep such system open and in good repair concurred in or contributed to the damage. Hanson v. City of Montevideo, 189 Minn. 268, 249 N. W. 46; Power v. Village of Hibbing, 182 Minn. 66, 233 N. W. 597. Finally, where a municipality assumes control and management of its streets and drains, it is required to exercise reasonable care to keep them in good repair. Bohrer v. Village of Inver Grove, 166 Minn. 336, 207 N. W. 721.

3. Defendant seeks to escape liability on the ground that the rainfall of May 29, 1942, was an extraordinary storm which could not reasonably have been anticipated by it. As above indicated, the trial court determined this question as a matter of law, notwithstanding that the evidence thereon was in conflict. In my opinion, because of such conflict, this issue was clearly for the jury. McClure v. City of Red Wing, 28 Minn. 186, 9 N. W. 767, and Taubert v. City of St. Paul, 68 Minn. 519, 71 N. W. 664, *supra;* National Weeklies, Inc. v. Jensen, 183 Minn. 150, 235 N. W. 905. As stated in the latter case (183 Minn. 154, 235 N. W. 907):

"The burden is upon the defendant to prove by a fair preponderance of the evidence that the damage was caused by such a [extraordinary] storm. If you find from the evidence that the storm on the day of plaintiff's injury was so severe, and the amount of water that came on plaintiff's premises in consequence of the storm was so great that plaintiff's premises would have been flooded and the injuries sustained by plaintiff would have occurred even though defendant had not cut the curb or taken up the paving, then your verdict must be for the defendant city."

In Power v. Village of Hibbing, 182 Minn. 66, 233 N. W. 597, it is true, we held as a matter of law that a rainfall of 3.05 inches in 45

minutes and a total of 5.12 inches in less than four hours was an extraordinary rainfall of unanticipated volume. There was testimony there, however, which indicated that the rainfall described had washed out bridges, streets, and roadways, and no conflicting evidence was submitted on this issue. Here, there is substantial testimony, as above set forth, which, if true, would establish that the rainfall of May 29, 1942, while heavy, was not an excessive or extraordinary rain, and, in fact, had been exceeded many times in the previous history of the city. If the jury supported this viewpoint, defendant could not escape liability on the theory that the damage was caused by an unprecedented and extraordinary rainfall.

4. There is also present here a conflict in the evidence with reference to the low point or natural depository for surface waters in this district. Plaintiffs' witnesses, whose testimony for present purposes must be accepted as true, testified that the lowest point and natural depository for surface waters here was some distance to the east of Forty-first and York. Witnesses for defendant, on the other hand, submitted evidence that the lots north of plaintiffs' premises comprised the lowest lands in the area and were the natural depository for surface waters. The credibility of witnesses and the conflict in the evidence on this point, in my opinion, also made these proper questions for the jury's determination. St. P. & D. R. Co. v. City of Duluth, 56 Minn. 494, 58 N. W. 159, 23 L. R. A. 88, 45 A. S. R. 491; O'Neill v. City of St. Paul, 104 Minn. 491, 116 N. W. 114; Schuett v. City of Stillwater, 80 Minn. 287, 83 N. W. 180; Bush v. City of Rochester, 191 Minn. 591, 255 N. W. 256.

In the Bush case, we approved the submission of this issue to the jury in the following language (191 Minn. 593, 255 N. W. 258):

*"The spread and diffusion of water over adjacent land is recognized as a necessary consequence of improvement. What is reasonable use is subject to question and in many cases must be determined by the jury upon the facts and circumstances of the particular case. \* \* \* If a municipality in the improvement of its streets collects surface waters, it is bound both to care for the same when reasonably practicable and to prevent damage to others. \* \* \* The court in-*

structed the jury that plaintiff must submit proof of the existence prior to the building of the graded street of a natural, well-defined channel or an artificial, well-defined channel through which surface waters flowed and must show that the damage to her property could have been avoided by the exercise of reasonable care on the part of defendant. * * * *The court further instructed the jury that if there was no channel, natural or artificial, before the improvement and the city diverted surface water from its natural course and cast the same upon plaintiff's property in destructive quantities or otherwise failed to exercise reasonable care to avoid injuring plaintiff's property, it would be obliged to respond in damages.* * * * The issue was by these instructions fairly submitted." (Italics supplied.)

Here, if the jury should determine that the lots just north of plaintiffs' premises constituted the natural depository of surface waters in this area and that the water falling in the May 29, 1942, storm would have flowed there to the same extent even though the improvements had not been installed by defendant, then, of course, no liability would exist therefor. This question, however, was exclusively for the jury, and in my opinion the majority viewpoint, in making a specific finding on this issue as though it were established by undisputed evidence, arbitrarily disregards the testimony of plaintiffs' witness and clearly usurps the jury's function with reference thereto.

5. Further, there is evidence that the city failed to maintain the sidewalks, curbs, and drainage system installed by it in this district and that its negligence in this respect may have contributed to plaintiffs' damage. Thus, there was testimony that defendant had permitted the sidewalks and curbs at the corner of Forty-first and York to sink below street level so that water from the curb could overflow the same, and that it had permitted the York avenue drain to sink some 15 inches below the level provided for it in the plan of construction, as it extended into Lake Calhoun, which may have caused the mouth of the outlet thereof to become clogged with mud and sand and retarded the discharge of its surface waters into Lake Calhoun. The law is well settled that a municipality, while not an

insurer of the safe condition of its sewers, is liable for damages resulting from its failure to exercise ordinary or reasonable care to keep them in repair and free from obstructions. Taylor v. City of Austin, 32 Minn. 247, 20 N. W. 157; Buchanan v. City of Duluth, 40 Minn. 402, 42 N. W. 204; Netzer v. Crookston City, 59 Minn. 244, 61 N. W. 21.

Before liability attaches, however, the municipality must have actual or constructive notice of the defects and a reasonable opportunity for remedying them. Taylor v. City of Austin, *supra;* Pottner v. City of Minneapolis, 41 Minn. 73, 42 N. W. 784; Baker v. City of South St. Paul, 198 Minn. 437, 270 N. W. 154; *Id.* 202 Minn. 491, 279 N. W. 211. Here, there was sufficient evidence to submit to the jury for its determination the questions whether the sidewalks, curbs, and drains in this district had become obstructed or in a state of disrepair because of defendant's negligence; whether defendant had actual or constructive notice thereof and a reasonable opportunity for eliminating such defective conditions; and, finally, whether such defective conditions proximately contributed to the damages sustained by plaintiffs.

6. The testimony on all conflicting issues has been outlined. The jury's findings thereon favorable to plaintiffs, in my opinion, find substantial support in the evidence above set forth and should be sustained within the rule of Weber v. City of Minneapolis, 132 Minn. 170, 172, 156 N. W. 287, 288, wherein we stated:

"Our examination of the record leads to the conclusion that the jury were justified in finding that by the improvements * * * the natural flow of the waters collecting at that point was down Forty-fourth street, and from there to Lake Harriet. They were also justified in finding that defendant was negligent in removing those improvements, and thereby changing the natural flow of such water, and diverting it down Upton avenue, without first providing adequate facilities for the same at that point, thus causing the water to flow upon and injure plaintiff's property. It is not a case showing a mere failure of the municipal authorities to protect the property owner from injury from surface water, but their wrongful conduct

in diverting such water from a natural course, and casting it upon private property. The evidence upon this subject made a case for the jury."

For the reasons outlined, I dissent from the majority opinion.

LORING, CHIEF JUSTICE (dissenting).

I agree with the views expressed by Mr. Justice Thomas Gallagher.

Inasmuch as Mr. Justice Frank T. Gallagher was not a member of the court at the time the oral arguments were heard, he took no part in this case.