**David CHABOT, Respondent,**

v.

**CITY OF SAUK RAPIDS,
Petitioner, Appellant.**

**Nos. C5–86–2212, C7–87–357.**

Supreme Court of Minnesota.

April 22, 1988.

Scott B. Lundquist, Minneapolis, for appellant.

Thomas A. Janson, St. Cloud, for respondent.

Thomas L. Grundhoefer, Clifford M. Greene, St. Paul, amicus curiae.

YETKA, Justice.

Appellant City of Sauk Rapids appeals from a decision of the court of appeals, which affirmed the trial court judgment, finding the city liable to respondent landowner for damage to respondent's home caused by flooding of one of the city's storm sewer holding ponds allegedly due to the city's negligence. We reverse with instructions to enter judgment for the City of Sauk Rapids.

Plaintiff-respondent, David Chabot, purchased a home in February 1983 from Wilbert Landwehr. The house, built by Landwehr in 1972, is located across the street from a natural ditch which functioned as a holding pond as part of defendant-appellant City of Sauk Rapids' storm sewer drainage system.

The city is drained by nine separate watersheds. The Pleasantview watershed, which covers Chabot's property, is a natural watershed. It consists of a natural ditch which carries surface water run-off into the Mississippi River. The holding pond was not built by the city. Although the body of water in question is called a holding pond, it was not shaped or created as such by the city. The road running alongside the pond was built at some unknown time in the past and acted to dam the water into a natural basin. The city has attempted to preserve the natural course of the flow of surface water. There was no evidence that the city had in any way diverted the flow of water from its natural course.

In 1972, when Landwehr applied for a permit to build his home, several city officials expressed some concern over the possibility of flooding. Eventually, the city planning commission granted a variance to Landwehr conditioned on steps being taken to maintain the natural waterway near the property.

The house sits at one of the lowest points in the landscape. The footings of the house go right to the stream bed. The residential lots surrounding the property are at a higher elevation. The elevation of the holding pond across the street is higher than the rear of Chabot's property. Thus, the contours of the land would appear to direct the flow of surface water across Chabot's property naturally.

Mark Johnson, formerly city engineer, reviewed the entire storm sewer system for the city in 1979. He determined that the city possessed several drainage problems, including the holding pond across from Chabot's house. As a result of Johnson's initial assessment of the potential problems, the city council commissioned Barr Engineering to review all drainage areas of the city and recommend improvements for the entire city drainage system, including the Pleasantview watershed. The completed report was over 60 pages long and was intended to furnish a guide for the city to improve its drainage system as needed over an extended period.

The Barr report identified a number of potential problem areas, including the holding pond near Chabot's house. The report gave no specific warning of any flooding or damage to Chabot's property. The holding pond was identified as important, but not necessarily as a first priority. The cost of the improvements recommended for just the Pleasantview watershed exceeded $600,000.

The procedures required before the city can make capital improvements are complicated and require a period of time to implement. Johnson, the city engineer who commissioned the Barr study, testified that it was not economically possible to implement the recommendations within 1 year. In fact, Johnson testified that an earlier attempt to upgrade a different storm sewer system in the city met with unprecedented public opposition.

By June 1983, the Barr report had not been implemented in the Pleasantview watershed. On June 25–26, 1983, during an extremely heavy rain storm, the holding pond overflowed. Chabot's property was flooded due to the run-off water, which flowed over the street in its natural course towards the river. The excessive amount of water caused extensive damage, eroding Chabot's front yard, exposing the basement walls to the foundation, causing structural and interior damage to the

house, and damaging trees in the yard. Damages were assessed at $53,000.

Chabot brought an action against the City of Sauk Rapids to recover these damages sustained in the flood. At trial, Dr. Charles Nelson, a hydrologist, testified that he had evaluated the pond. He determined that its capacity was limited and could overtop the road if 1.3 inches of rain fell in a half-hour period. The probability of that amount of rain within a half-hour period was estimated at approximately 10% per year. The half-hour period is critical because all rain within the watershed collects in the holding pond within half an hour. However, the pond had not overflowed in at least 66 years.

There were no rain measuring devices in the city so it is not known how much rain fell on June 25-26. The United States Weather Service reported heavy rain in the county. All witnesses who testified noted the unusually heavy rain which fell. Although the city argued that the amount of rain was extraordinary, the jury was instructed that if the rain was "extraordinary," the city was not the direct cause of the damages. Although the exact rainfall in the city cannot be determined, in the expert hydrologist's opinion, the heaviest rainfall estimated in a half-hour period was 1.4 inches, sufficient to cause the pond to flow over the road. Nelson indicated that this was probably a so-called "10-year rain."

Although Chabot's complaint alleged numerous counts, the case was submitted to the jury solely on a negligence theory. The trial court instructed the jury that the city could be found negligent for damages caused by its failure to act after having notice of or knowledge that its drainage system is inadequate and constitutes an unreasonable risk of harm to adjacent property. The jury found the city negligent and that the city's negligence was a direct cause of $53,000 in damages to Chabot's home.

The trial court entered judgment, concluding that the city's defense of discretionary immunity was waived by its procurement of liability insurance under Minn.

Stat. § 466.06 (1982). The city appealed on the issues of liability and damages. Chabot appealed the trial court's calculation of pre-verdict interest. The two appeals were consolidated in *Chabot v. City of Sauk Rapids*, 412 N.W.2d 371 (Minn.App.1987). The court of appeals, in a split decision, affirmed the trial court on the issues of liability and damages and reversed its calculation of interest. The city seeks further review only on the issues of liability and immunity.

The issues the parties raise on appeal are:

I. Is the decision of a city council concerning major capital improvements to its existing drainage system an immune discretionary function under Minn.Stat. § 466.03, subd. 6 (1986)?

II. If the decision constitutes an immune discretionary function, did the city waive its immunity defense by the purchase of liability insurance under Minn.Stat. § 466.06 (1982)?

III. If immunity has been waived, is a city liable in tort for its decision not to make major capital improvements to its existing drainage system after notice that the system may be inadequate?

IV. Did respondent create a jury question on the city's negligence without expert testimony on the appropriate standard of adequacy of the system?

On the first issue, the court of appeals merely concluded that the city's decision not to remedy the pond was "an operational level decision" outside the scope of protected immunity under Minn. Stat. § 466.03, subd. 6 (1986). *Chabot*, 412 N.W.2d at 376. As we have stated, the simple conclusory labeling of government conduct as "operational" or "planning" is not helpful. *Cairl v. State*, 323 N.W.2d 20, 23 n. 2 (Minn.1982). In our decision of *Nusbaum v. State*, 422 N.W.2d 713 (Minn. 1988), we made clear that certain government conduct is protected under the discretionary function exception not simply be-

cause it is identified as a planning decision. Rather, it is immune because the specific function involves policy-making that can be made only by the legislative or executive branch of the government. Where the policy-making involves a balancing of social, political, or economic considerations, the conduct is immune as a discretionary function. The challenged conduct here was clearly of a policy-making nature. Governmental immunity would, therefore, apply under the discretionary function exception. Minn.Stat. § 466.03, subd. 6 (1986).

■ However, a city may waive immunity by the purchase of liability insurance under Minn.Stat. § 466.06 (1982). The city had such insurance here. Thus, the sole issue remaining is whether plaintiff met his burden of proof that the city was negligent, that is, under the facts as presented, whether it possessed and breached a duty of care to Chabot. We think that it did not.

Merely because an accident occurs and immunity is waived does not, in and of itself, establish liability of a municipality. The statute merely waives the city's immunity defense. It does not create tort liability where none existed previously. Plaintiff still has the burden to show what action or inaction constituted negligence on the part of the city, entitling the plaintiff to recover. While it is true that the city has the duty to exercise reasonable care to maintain its facilities in a safe condition, *see Cracraft v. City of St. Louis Park,* 279 N.W.2d 801, 803 (Minn.1979), that general rule is inapplicable to the facts of this case.

■ None of the cases cited by the majority below present the issue raised under these particular facts. In *Pettinger v. Village of Winnebago,* 239 Minn. 156, 162, 58 N.W.2d 325, 329 (1953), for example, the city was found liable for its negligent failure to repair and maintain an inadequately designed sewer system. Similarly, in *Greenwood v. Evergreen Mines Co.,* 220 Minn. 296, 303, 19 N.W.2d 726, 730–31 (1945), the city was held liable for its negligent affirmative actions which blocked the natural outlet of a lake, causing overflow and flooding on the plaintiff's property. *See also Stoehr v. City of St. Paul,* 54

Minn. 549, 553, 56 N.W. 250, 251 (1893) (city liable for negligent maintenance of storm sewer which caused clogging of culvert and subsequent flooding). In short, the cases relied upon by the court of appeals establish municipal tort liability for either intentional or negligent actions which divert the natural flow of water, causing damage to property which would not normally be in its path. In the present case, however, Chabot's property was damaged because it was in the path of the natural flow of water from the holding pond. There was no evidence that the city's actions in any way changed the direction of the water's natural flow, causing it to flow onto Chabot's property. Rather than being held liable for somehow *diverting* the natural flow of water onto Chabot's property, as was established in the preceding cases, the city's liability here appears to have been predicated on its *failure* to divert or hold back the natural flow of water. That is not the basis of liability which has been established under Minnesota tort law.

A case which appears to be more similar to the present facts is *Roche v. City of Minneapolis,* 223 Minn. 359, 27 N.W.2d 295 (1947), not cited by the court below. *Roche* held that a city is not liable for water damage to private property, despite the inadequacy of its drainage system, when the private property was the natural depository of the water discharged. Relying upon established principles of tort law, the court found that, when the city had not unnecessarily discharged water upon private property, it cannot be held liable for failing to prevent a natural result. A city is not required to be an insurer for all water damage from the natural flow of surface water. As the court said in *Roche*: "The only complaint plaintiffs can make is that the municipality did not do more and wholly relieve the premises of surface and infiltrated water." *Id.* at 365, 27 N.W.2d at 298. The court in *Roche* found no liability for water damage when the city had not gathered surface waters into a large body and cast them in large quantities in an area where they did not previously flow. *Id.*

*See also Dudley v. Village of Buffalo,* 73 Minn. 347, 76 N.W. 44 (1898). That seems to be the underlying basis of Chabot's complaint here. However, under *Roche* and *Dudley,* the city is not liable for that result.

█ Significantly, the trial court dismissed all allegations of negligent maintenance at trial, finding no evidence of any improper maintenance or blockage resulting from the city's actions or inactions. Thus, the basis of tort liability in the cases relied upon by the court below (*e.g., Pettinger; Greenwood*) is not applicable to these facts. The only allegation of negligence remaining which was submitted to the jury was based solely on the alleged inadequacy of the holding pond. The majority of the court below appeared to hold, as the dissenting judge pointed out, that "inadequacy is the equivalent of negligence." 412 N.W.2d at 379 (Sedgwick, J., dissenting). Under *Roche,* however, mere inadequacy of the drainage system is not the basis of tort liability under Minnesota law. A city has never been required to install a sewer system or to install a system that is adequate to take care of all water. *Roche,* 223 Minn. at 365, 27 N.W.2d at 298. In other words, while there is a duty to repair and maintain, there is no duty to build.

One fact does distinguish this case from *Roche* and appears to have been a significant factor in the lower court's determination that a duty existed and was breached. The city had received notice, by means of the 1981 Barr report, that this holding pond, as well as several other storm water areas in the city, was potentially inadequate. At the time of the incident in 1983, the city had failed to act to implement the suggestions in the Barr report, as applied to this or apparently to any other watershed in the city. It is this failure to act which has served as the sole basis for the city's liability.

It is at this point that the lower court's analysis becomes completely inadequate. It is not clear precisely what duty has been imposed on the city as a result of its notice of the possible inadequacy of this holding pond. The Barr report covered other watershed areas of the city and made suggestions for needed capital improvements in other areas as well as this one. Even in its assessment of this holding pond, the report did not specifically advise the city that there was an unreasonable danger of flood damage. The cost of implementing the recommended improvements for this watershed was in excess of $600,000. The city introduced evidence that its decision not to act to implement the suggested capital improvements resulted in part from very strong public opposition to increased expenditures. There was no evidence that the city ever had sufficient funding to implement any portion of the Barr report prior to 1983.

In effect, the imposition of liability here has usurped the city's discretion to decide how or when to act to implement any part of the Barr report. The court and the jury have effectively decided that it was necessary for the city to implement this particular section of the Barr report. Notice of inadequacy was converted to an absolute duty to rebuild. However, no consideration was given to the city council's need to make this decision while considering the best interests of the rest of the community, especially as those interests would be affected by a decision to implement (or not to implement) the remainder of the lengthy report. The report did more than address the possible inadequacies of this one small holding pond. Liability has been imposed, however, because the city failed to implement one suggested improvement without properly considering the context of the city's decision or the need to determine which of the many other suggested improvements was to be given priority. The reality of the situation was that the city did not and could not act immediately to implement the Barr report. The mere acceptance of the report should not be held to have imposed a duty on the city to act at once to correct every inadequacy pointed out in the report. Under the lower court's holding, it would be theoretically possible for the city to be held liable in negligence to everyone who is injured due to the city's failure to implement the Barr report. Thus, *receipt of the Barr report alone is an* insufficient basis for liability.

■ It is possible that plaintiff could have shown that, in addition to the Barr report, the city had approved a number of building permits in the immediate vicinity of the Chabot home which added additional run-off of water into the holding pond. He could perhaps have shown by expert testimony that these permits increased the risk of damage to the plaintiff's home. However, other than vague and general references to growth in the watershed area, this evidence, even if available, was not presented.

A city can be liable for trespass or nuisance caused by such an increased flow of water or by a change in the flow of water which affected its normal and natural flow. *See Wilson v. Ramacher*, 352 N.W.2d 389, 394 (Minn.1984). However, that issue was dismissed by the trial court and was not appealed. Plaintiff elected to proceed at trial and on appeal on the negligence theory alone and has wholly failed, as a matter of law, in our opinion, to prove the essential elements of his case.[1]

Therefore, under the unique facts of this case and the theory of law on which this case was tried, we must reverse the court of appeals and the trial court. We remand to the trial court with instructions to enter judgment for appellant city.

[1.] Having determined that mere inadequacy of a holding pond is not grounds for a negligence suit, we need not reach the fourth issue regarding the lack of expert testimony on the appropriate standard of adequacy.