Mark R. **CHRISTOPHERSON,**
et al., **Respondents,**

v.

**CITY OF ALBERT LEA, Appellant.**

No. C4–00–1561.

Court of Appeals of Minnesota.

March 13, 2001.

Edward E. Beckmann, Miller & Kellermeier, P.A., Edina, MN, for respondents.

Mary D. Tietjen, Carla J. Heyl, League of Minnesota Cities, St. Paul, MN, for appellant.

Considered and decided by
TOUSSAINT, Chief Judge,
HALBROOKS, Judge, and FOLEY,
Judge.*

## HALBROOKS, Judge

Respondents Mark R. and Karrie K. Christopherson sued appellant city Albert Lea, alleging the city was liable on several theories for damage to their home resulting from sewer backup. The city brought a motion for summary judgment. The district court granted a portion of the motion, dismissing respondents' theories of breach of contract and a taking of property without just compensation. But the district court denied the portion of the city's motion seeking an immunity-based summary judgment under Minn.Stat. § 466.03, subd. 6 (2000). The city appeals, alleging that the conduct at issue-the city's management of its sewer system—involves planning-level decisions that entitle it to immunity. Because we conclude that the city's choice of maintaining its systems is a policy-making decision, the city is entitled to statutory immunity. We reverse.

## FACTS

Respondents live in the Virginia Place neighborhood, the lowest part of the city. Over the years, this neighborhood has suffered periodic flooding following intense rainfall. After flooding in 1978, the city encouraged residents to move out of the area by providing funding to relocate. Respondents purchased their home in 1987 from a resident who decided not to relocate. Before the July 13, 1997 storm in-

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

Minn. Const. art. VI, § 10.

volved in this matter, respondents had never experienced a sewer backup in their home or complained to the city about any problems with the sewer system.

The city system has two separate types of sewers—storm and sanitary. But sanitary sewers are designed to handle a certain amount of inevitable infiltration or inflow (I/I) of storm water. The city has 19 sanitary-sewer-lift stations and 4 storm-sewer-lift stations to reduce water levels in the city's approximately 100 miles of sanitary-sewer lines. When sewage reaches a certain level, one of the lift station's two pumps begins pumping water out of the sewer. Both pumps may be activated if the sewage reaches too high a level. Lift stations are inspected every day and repaired or replaced as necessary. The city attempts to upgrade one lift station each year with new pumps. Respondents' neighborhood is serviced by the lift station at 6th Street and St. John Avenue ("the 6th Street station"). The 6th Street station was built in 1930 and had its pumps replaced in January 1971. The policy for annual maintenance and inspection of the sanitary sewer system includes jetting approximately one-fourth of the system and cleaning 35 locations. The portion of the sewer that serves respondents' residence is one of seven locations that is cleaned twice a year.

The city commissioned an engineering study of its sewer systems in 1975 to determine whether or not the city's sewer system had excessive I/I. As a part of its analysis, the independent engineering firm concluded that the most cost-effective approach to addressing I/I was to provide wastewater facilities to transport and treat waste rather than attempting to reduce I/I levels. The city adopted the recommendation and constructed a wastewater treatment plant at a cost of over $33 million. The work was completed by 1983. There were no reported problems with sewer backups between 1983 and 1993.

In 1993, the city was one of several Minnesota communities that experienced substantial flooding. The flooding caused problems with the infiltration system that reduces the amount of excess storm water that indirectly enters the sewers. The city council considered its options to address the increased infiltration levels and chose to take corrective action in problem areas rather than undertaking a city-wide infiltration study. The city also enacted an ordinance in 1995 that prohibits connection of roof, groundwater or surface water drains to the sanitary sewer system.

On July 13, 1997, heavy rainfall caused flash flooding in the city. The flooding was so extensive that the lift stations could not accommodate the excess water draining into the sewers. Although the sanitary-sewer-lift stations operated properly, some could not keep up with rainfall. The storm occurred late on a Sunday evening, but a city superintendent was able to assemble ten employees to effectuate the city's emergency response plan. Within an hour and 15 minutes of the storm's beginning, city crews made sure that the four storm-sewer-lift stations were operating; inspected the 19 sanitary-sewer-lift stations; and placed portable pumps at seven of the stations that could not keep up with the flow of water, including the 6th Street station.

The next morning, respondents discovered one and one-half feet of raw sewage in their basement. The cost of cleaning and repairing respondents' basement and compensating their property loss was $17,745.82. Respondents sued the city, alleging four causes of action: breach of contract, negligence, nuisance, and inverse condemnation. The city moved for summary judgment on the ground that it was entitled to statutory discretionary immunity under Minn.Stat. § 466.03, subd. 6 (2000).

The district court dismissed respondents' breach of contract and condemnation claims, but denied summary judgment with respect to respondents' negligence claim. The court also found that the city

could not raise a statutory-immunity defense. This appeal follows solely on the issue of statutory immunity.

## ISSUE

Is the city entitled to statutory immunity based on policy-making decisions?

## ANALYSIS

■ We review an order denying summary judgment by determining whether there are genuine issues of material fact and whether the district court erred in applying the law. *Gleason v. Metropolitan Council Transit Operations,* 582 N.W.2d 216, 218–19 (Minn.1998). Whether immunity applies is a legal question, which is reviewed de novo. *Id.* at 219. The party asserting a defense of immunity has the burden of proof. *Gerber v. Neveaux,* 578 N.W.2d 399, 402 (Minn.App.1998), *review denied* (Minn. July 16, 1998).

The common law doctrine of government immunity for municipalities was essentially abolished in *Spanel v. Mounds View Sch. Dist. No. 621,* 264 Minn. 279, 118 N.W.2d 795 (1962). Today, such immunity exists as a matter of legislative grace. *See* Minn. Stat. ch. 466 (2000). The statute immunizes municipalities against certain claims, including "[a]ny claim based upon the performance or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused." Minn.Stat. § 466.03, subd. 6. Further, the statute places limitations on the extent of a municipality's liability. Minn.Stat. §§ 466.04 (establishing maximum limits of liability), 466.06 (procuring liability insurance waives a municipality's liability only to the extent of coverage).

■ Such immunity, commonly referred to as statutory or discretionary immunity, prevents judicial review of executive and legislative policy-making decisions. *Zank v. Larson,* 552 N.W.2d 719, 721 (Minn.1996). Although nearly all governmental acts require some discretion, the statute only protects acts that require the balancing of policy objectives such as social, economic, and political factors. *Christensen v. Mower County,* 587 N.W.2d 305, 307 (Minn.App.1998). Courts have interpreted the statute granting immunity narrowly. *Conlin v. City of St. Paul,* 605 N.W.2d 396, 400 (Minn.2000).

■ Determining whether a municipality is entitled to immunity involves a two-step test. *Angell v. Hennepin County Reg'l Rail Auth.,* 578 N.W.2d 343, 346 (Minn.1998). The first step is to ascertain exactly what governmental conduct is being challenged, and the second step is whether the conduct is operational or policy-making. *Id.* at 346–47. Policy-making decisions

> are those involving questions of public policy, that is, the evaluation of factors such as the financial, political, economic, and social effects of a given plan or policy. Operational level decisions, on the other hand, involve decisions relating to the ordinary day-to-day operations of the government.

*Holmquist v. State,* 425 N.W.2d 230, 232 (Minn.1988). Distinguishing between policy-making activities and operational activities involves gray areas, but "the underlying consideration is whether the conduct involves the balancing of public policy considerations in the formulation of policy." *Angell,* 578 N.W.2d at 347 (quotations omitted).

■ Here, the city contends that the district court erred in the initial step of the analysis because it failed to identify the precise conduct being challenged. The district court stated that it agreed with respondents that "[i]t is not a policy decision to not know how much sewage is flowing through" the city sewage system. The city argues that the court should have found that its conduct was policy-making because it involved long-term decisions regarding its budget and sewer maintenance, repair, and inspections. Therefore, the city argues Minn.Stat. § 466.03, subd. 6,

shields it from the consequences arising from those decisions.

We agree with the city and conclude that the conduct at issue here is the manner in which the city maintained its sewer system. As the Minnesota Supreme Court held, a "city's decision not to remedy" a defect in its sewer system "was clearly of a policy-making nature." *Chabot v. City of Sauk Rapids*, 422 N.W.2d 708, 710–11 (Minn.1988). Although *Chabot* involved a defective storm sewer system rather than a sanitary sewer system, *Chabot* closely parallels this case in that in both cases the city decided not to make immediate capital improvements to its sewer systems because of budgetary constraints, and when hit by an extraordinary storm, the city's sewage system was unable to cope with the excess drainage. Property damage resulted to residents in "the lowest points in the landscape." *Id.* at 709.

Further, the record contains evidence that the city did engage in the weighing of issues that entitles it to immunity. The independent report commissioned by the city made a recommendation how to deal with the infiltration that the city adopted. *Cf. Chabot*, 422 N.W.2d at 709 (noting that the city's capital improvement recommendations called for fixing the defect that caused flooding but that it was not an immediate priority). Such a decision was clearly policy-making, not operational, in nature because it involved balancing financial and policy considerations.

Respondents believe the 1975 report and other discussions about the cost of capital improvements "are irrelevant to this claim because they discuss the entirety of the storm water system and sanitary sewer system." We disagree. We do not believe that it is necessary for the city to introduce some document that specifically addresses the 6th Street station or the Virginia Place neighborhood to be entitled to immunity. The conduct at issue here is the city's decisions concerning a problem with its infiltration system. Although the consequences of infiltration may have im-

pacted respondents' low-lying neighborhood more severely than other areas, the problem affected the entire city. Therefore, the report and other documents are relevant because they suggest that the city was aware of the infiltration problems with the system and attempted to address them in a financially feasible way.

Respondents also argue that city employees failed to perform at least eight fundamental duties, and that this failure led to improper maintenance of the sewer system. Respondents contend that the failure to perform these duties is based solely on operational decisions made by city employees and, therefore, the city is not entitled to statutory immunity. If the employees had fulfilled these duties, respondents believe the damage to their property could have been avoided.

Respondents correctly note that there is a long line of cases establishing that a municipality "is liable for damages resulting from its failure to exercise ordinary or reasonable care to keep [its sewer] in repair and free from obstructions." *Jindra v. City of St. Anthony*, 533 N.W.2d 641, 643 (Minn.App.1995) (quotations omitted). But none of these cases addresses the issue of statutory immunity.

■ Further, if the relevant conduct at issue involves a combination of policy-making and operational decisions, then the city is still entitled to immunity. *Fisher v. County of Rock*, 596 N.W.2d 646, 652 (Minn.1999) ("[I]f in addition to professional or scientific judgment, policy considerations played a part in making a decision, then planning level conduct is involved and statutory immunity applies." (citation omitted)). Thus, even if city employees were negligent in performing operational duties, it was due in part to the city's funding decisions not to purchase alarms and flow or time meters.

## DECISION

The city demonstrated that its conduct involved policy-making when it decided

how to maintain its sewage system. We find that it is entitled to immunity under Minn.Stat. § 466.03, subd. 6 (2000), from the consequences of this decision and, therefore, we reverse the district court's decision.

**Reversed.**