Miles G. Burford and Janice H. Burford, Plaintiffs-Appellees, v. Village of La Grange, a Municipal Corporation, Defendant-Appellant.

Gen. No. 50,834.

First District.

December 20, 1967.

Rehearing denied January 17, 1968.

William J. Linklater and Jerome H. Torshen, of Chicago (Jerome H. Torshen, of counsel), for appellant.

Edward J. Barrett, of Chicago, for appellees.

MR. PRESIDING JUSTICE SMITH delivered the opinion of the court.

The plaintiffs obtained a jury verdict of $21,000 for water damage to their residence resulting from allegedly inadequate or defective village storm sewers. The trial court ordered a remittitur and reduced the judgment to $12,070.46. Plaintiffs consented to the remittitur as a condition to the denial of a new trial, but reserved their right to question the propriety of the remittitur on appeal in accordance with Ill Rev Stats 1965, c 110, § 68.1. By its appeal, the village attacks the judgment so entered and the plaintiffs attack the propriety of the remittitur.

The defendant-appellant first asserts that the trial court should have directed a verdict in its favor as requested. The home of the plaintiffs is located on the northwest corner of the intersection of Elm Street and Sunset Avenue in the village and faces Elm. There is a storm sewer in Sunset. A spur drain located on the plaintiffs' property and terminating at the back of the property connects with this sewer. The downspouts to the house drain into this spur sewer. The liability of the defendant-village to the plaintiffs must be predicated upon the existence of some duty owed by the village to the plaintiffs in connection with (a) the Sunset Avenue drain or (b)

211

the spur drain located wholly upon plaintiffs' property and a breach of that duty. There is no evidence in the record that the village constructed the sewer in Sunset, the spur drain, or that either was constructed by a private party and subsequently dedicated to the village. The village manager testified that the records of the village show a meeting on June 7, 1915, and the "granting of permission to a subdivider for the installation of sewers on Sunset Avenue." Plaintiffs' Exhibit No. 48 is a plat of such drains and shows their location in Sunset. There are no connecting spur drains located on private property shown in this exhibit. The construction or ownership of a drain or sewer is, however, basically immaterial.

> ". . . where a municipality has adopted a sewer or drain constructed by a private person and has assumed control over it, the fact that the municipality has not constructed the sewer or drain will not excuse the municipality from liability for negligence in its operation." ILP, Cities, Villages, and Other Municipal Corporations, § 554, p 136.

The village manager testified on behalf of the plaintiffs that, he became manager on August 1, 1957; there was an inspection of the village sewers prior to that time; during his employment there had been an inspection of the sewers on a regular basis; there was a program of maintenance to clean all catch basins or street inlets at least once every other year; and this system is still in effect. It further appears that a supplementary or auxiliary storm sewer was placed in Sunset after the flood of July 1957. It thus appears that the village had assumed the inspection, maintenance and the repair of the storm sewer in Sunset and was therefore under a duty to the plaintiffs not to be negligent in the performance of that duty.

As to the spur drain on the plaintiffs' property, it is shown on the map of the village sewer system now hang-

212

ing in the village hall. That same map shows privately-owned storm sewers on private property of others. The village engineer who prepared the map explained that the presence of these spur drains on the village map was so that the village would be advised and informed of the private sewers draining into the village sewer. There is nothing in the village records or elsewhere indicating that the village had an easement to either install or maintain this spur sewer on plaintiffs' property and normally such an easement would be obtained. The evidence further shows that during the repair of the property, the plaintiffs poured concrete into the spur drain and effectively plugged it. Thereafter sometime in 1958, at the request of the plaintiffs, the village likewise plugged this sewer in the village street at its connection with the village sewer.

The village manager testified that he didn't know whether the spur drain into the plaintiffs' property was inspected or cleaned, and a search of the records did not disclose an application by or a permit issued to the property owner for permission to attach this particular spur drain to the village's sewer. No one testified to any inspection or maintenance by the village. The presence on the village map of this spur drain and of other privately-owned spur drains creates no presumption of village ownership or control where direct testimony of the engineer who prepared the map is that it was for information only. On this record, therefore, it seems transparently clear that the village neither owned the spur drain nor had they inspected it and maintained it. The record is thus barren of any facts creating an obligation or duty on the defendant-village to maintain, inspect, or repair this spur drain.

■ Let us turn now to the occurrence events which precipitated this suit. Plaintiffs acquired this seven-room, two-story, frame-colonial house on October 2, 1954, and moved in around November 1 the same year. In October, prior to occupying the house, Mrs. Burford noticed surface

213

waters in the intersection at Sunset and Elm, but did not then examine the house. In July 1955, there was a heavy rain and water started coming into their basement and reached a depth of approximately 2 inches. In September of the same year, a like rain occurred and this time the water reached a height of 6 inches. In August or September 1956, the third rain occurred and the water in the basement reached a height of approximately 8 inches. In July 1957, there was a heavy rain and flood and this time the water reached a depth of from 4 to 6 feet, remained in the basement overnight, and a deep freeze, sewing machine, and other furniture and articles were floating around. Mrs. Burford noticed a slushing of water and a rocking and shaking of the house. She called the fire department to disconnect the electricity and was advised by them to move out with her children. At this time, there was a sea of water across the street in all directions, their lawn was under water, and it was the same at the neighbors. She and the children moved out. There is little doubt but that the rain in July 1957, was a gully-washing, frog-strangling rain. Plaintiffs' witness Reed testified "we had a 7-inch rain and at that time it reversed the flow of the Chicago River—it got so heavy that it flooded the Daily News basement." The official report of the United States Weather Bureau read in part as follows: "The deluge on the evening of the 12th set new 6 and 24-hour rainfall records for Chicago . . . The heavy rainfall resulted in severe flooding, and practically paralyzed transportation. Damage ran into the millions of dollars." A professional meteorologist testified that the record rainfall on July 12 was substantially greater than anything that had officially been recorded before that time, and that similar rainfalls of that encountered on July 12 could not be expected to return for well in excess of 100 years. It has been stated:

". . . even if there is negligence concurring with an extraordinary flood or rainfall, the municipality is

214

relieved from liability if the flow is so voluminous in character that it would of itself have produced the injury independently of such negligence. In other words, if the superior force would have produced the same damage whether or not the municipality had been negligent, its negligence is not deemed the cause of the injury." CJS, Municipal Corporations, § 879.

In Carlson v. A. & P. Corrugated Box Corp., 364 Pa 216, 72 A2d 290 (1950), the Supreme Court of Pennsylvania stated:

". . . a unanimous host of authorities, both in our own Commonwealth and elsewhere, . . . uniformly hold that although no liability can be fastened upon the defendant if the damage is caused by an act of God so overwhelming as of its own force to produce the injury independently of the defendant's negligence, such liability does arise if the damage results from the concurrence of the defendant's negligence with the act of God and the damage would not have occurred in the absence of such negligence."

See also 59 ALR2d 324, § 19(a) ; Bouillon v. City of Greenville, 233 Ill App 500. Assuming without presently holding that the defendant-village was negligent, we think it abundantly clear as a matter of law that the defendant-village cannot be liable to the plaintiffs on any part of their damages occasioned by the flood of July 12, 1957. It seems clear from this record that the flood was so overwhelming and so devastating that the damages to the plaintiffs would have occurred notwithstanding any independent negligence of the defendant-village. 59 ALR2d 326, § 19(b).

During the fall of 1957, the plaintiffs repaired their home. To do so, it was necessary to jack up the entire house on hydraulic lifts, remove and rebuild the entire basement and foundation at a cost of $12,070.46, the precise amount of the judgment entered in this cause.

215

The evidence discloses that the intersection of Sunset and Elm was a swamp in 1915, and that a portion of the plaintiffs' lot was included in it; the natural drainage in the area was towards this intersection; and the composition of the soil was such that this house began to settle shortly after it was built. Mrs. Burford had noticed a large, running diagonal crack on the east wall when they inspected the property prior to purchase. Mr. Burford testified that he was home during the September 1955 episode; the water came in mostly up through the floor and in the joints between the walls and the floor in the south end of the building; there may have been some backup, but this was nominal, and the majority of the water came in through the foundation of the basement floor. The record further shows that after the 1957 flood the east wall bulged inward and the basement floor heaved upward.

Plaintiffs' witness Flood, a licensed, civil engineer, in response to a hypothetical question specifically limited to a blockage of the spur drain and specifically excluding any blocking of the Sunset Avenue drain, was asked whether or not the blocking of the sewer could have been a contributing factor in the damage to the foundation wall. He stated that such blockage could have been a contributing factor to the damage, and this "is based on the opinion that in the blockage of a sewer, a build-up of water behind the sewer is transmitted to the outside of the basement walls and floor. This pressure, in effect, pushing against the walls can push the walls inward, causing bulging and cracking of the walls. Also, the same pressure results in a (sic) uplift of the floor and can result in cracking of the floor and is called hyrostatic (sic) pressure." On cross-examination, he also testified that "a jagged diagonal crack in a foundation is not necessarily indicative of settlement, but can be indicative of lateral pressure and, if such a diagonal crack existed in 1954, it would indicate there had been pressures on that wall prior to that day." He further testified that "if the house was underpinned

216

in part, it connotes that the foundations which were weakened were strengthened; you underpin a house to strengthen the foundation and underpinning can be due to the need to place an additional load on a specific foundation or due to the fact that the soil below the foundation will not support the original load."

Defense witness O'Brien testified that he was a registered, professional engineer in Illinois and Wisconsin, and he had been employed by Mr. Burford in the fall of 1957 to make recommendations in the underpinning operation which was then in progress. His report shows that the original foundations of this house were 10-inch, cinder-brick walls supported at basement floor level by a four-inch-thick concrete footing approximately 14 inches wide. His recommendation to Mr. Burford as shown by the report was that the new foundation be a continuous reenforced wall and footing, and that the footings should be at least 4 feet wide and, if economically possible, larger. In testifying that the heavy rainfall could have resulted in the bulging, he stated: "The bulge would have occurred to the wall, (1) if the wall had not been highly reenforced, and (2) with the heavy rainfall a large amount of hydrostatic pressure would develop from surface water in the back of the foundation wall, resulting in this movement of the wall which would have occurred from inadequate reenforcing or insufficient reenforcing." He further stated that "if the walls were thick and adequately reenforced, this buckling would not have occurred." He further stated that this buckling or bulging could not have resulted from a sewer backup, and that "if the bulging is toward the inside, pressure has to be from the outside, from the surface water that accumulates behind the foundation walls. Outside hydrostatic pressure could be a cause of damage to the foundation."

Plaintiff's witness Reed was the plumber on the job during the repairs. In attempting to find where this water was coming from, they dug around in the yard

217

southeast of the porch, which is on the southside of the house, and found this 8- or 10-inch spur drain. They tried to determine where it came from, because the main sewer of the house was on the northside of the house. They took a sewer rod and pushed it back to see where it went in each direction from the hole they had dug. In rodding towards the east and towards Sunset, they encountered no obstruction and water would run out and go towards the east or towards Sunset. In rodding the other way, they found they couldn't go very far, because it was plugged with mud and debris and gunk, or soupy mud. This debris was filling up the drain between the main sewer on Sunset and the house. He further testified that this blocked drain could have been a contributing factor of the damage to this foundation, that the blocked drain could have diverted water onto the plaintiffs' premises which found its way into the foundation and basement.

Molding this testimony into ultimate facts, it seems transparently clear that (1) faulty, inadequate and insufficient basement construction for this particular area contributed no small part to the damage sustained, (2) the damage occasioned by the deluge of 1957 would have occurred irrespective of any negligence on the part of the defendant-village, and (3) the blockage in the spur drain on the plaintiffs' property contributed immeasurably to the development of the outside, hydrostatic pressure which caused the bulging of the east wall and the upheaval of the basement floor. This third act is emphasized when we consider that the downspouts to the house were connected to the spur drain, that there is no evidence the spur drain was directly connected to the basement, and the fact that except for a nominal amount, the water was coming into the side walls and bubbling from the floor.

■ Up to this point, therefore, the village cannot be liable for the damage occasioned by the faulty construction of the basement nor the flood of 1957. It seems equally clear that it is not responsible for any damage

218

occasioned by the stoppage of the spur drain. The rule is stated thusly:

> "Ordinarily the city is only liable for the clogging or obstruction of drains and sewers maintained by it or over which it has control, with the result that it is not liable for the clogging of a drain or sewer maintained and controlled by a private property owner." 59 ALR2d 314, § 11.

We turn now to a consideration of the negligence of the village, if any. Such negligence must be predicated upon a failure to properly inspect—and the evidence is that it did inspect—or a defective or blocked village sewer —and the evidence is that it wasn't—or the inadequacy of the sewer system itself. Plaintiffs' witness O'Malley was employed by the Village of La Grange from July 1957 to September 1963 as its civil engineer. Following the flood of 1957, he caused a survey to be made of Sunset Avenue and recommended a supplemental sewer which was installed in 1958 or 1959. He testified as follows:

> " 'In 1957, there was no crack in the pipes in the sewer line on Sunset. The water flowed freely through that sewer except that there was probably a 6 inch pocket at Sunset and Elm which shows on the plans that we made up. In a heavy rain, water would flow freely provided Cossitt Avenue was below its capacity and it wasn't overloaded. There was no break or no obstruction in the sewer. There was a flow. On direct examination, I testified that the Cossitt Avenue sewer was not large enough to handle that type of rainstorm as occurred on July 12 and 13, 1957.' "

He further testified that there was a sag in the Sunset Avenue sewer about 50 feet on either side of the manhole, that the sag wouldn't do it any good, and "whether it

219

does it much harm—it wouldn't—it wasn't designed that way." He further testified:

> " 'I would say that Mr. Burford's main problem, unless he had an overhead sewer, came from the house connection that goes into Sunset Avenue, in my opinion. If he had an overhead sewer there and if things were really tight, then he probably wouldn't have had this problem.' "

He further testified that he didn't think the spur line did the property any good, but how much harm it actually did, he didn't know. He also testified that even if there was an overhead sewer, it is possible that the water could have seeped in under the foundation or along side of the drainage tile on the outside of the wall. There is no evidence in the record establishing whether or not the other occurrences which Mrs. Burford testified about were normal or abnormal rainfalls. In Illinois, the rule is stated thusly:

> ". . . where a municipality provides ample sewers and drains to carry off all water likely to fall or accumulate under ordinary conditions, the fact that the sewers and drains prove inadequate to carry off all the water from an extraordinary rainstorm, does not subject the municipality to liability for damages caused by the surplus water.

> ". . . it is liable only for such injuries or damages which are the proximate cause of such negligence." ILP, City, Villages and Municipal Corporations, p 136, § 555.

■■ It is now the rule in Illinois, that verdicts may be directed and judgment n.o.v. entered in those cases in which all of the evidence when viewed in its aspect most favorable to the opponent so overwhelmingly favors movant that no contrary verdict based on that evidence

220

could ever stand. Pedrick v. Peoria & E. R. Co., 37 Ill2d 494, 229 NE2d 504. The picture, vivid and clear painted by this evidence, is that this house was originally constructed in a low and swampy area; that settlement of the house began soon after its construction; that the foundation and basement construction was wholly inadequate from an engineering standpoint for the area in which it was built; that the stoppage in the spur drain materially contributed to the damage to the foundation as the downspout water had no place to go except into the adjacent soil to build up hydrostatic pressure against the outside of the walls and floor, and that there is no evidence that the Sunset Avenue sewer was inadequate to handle an ordinary rainfall, nor is there any evidence from which it could be reasonably concluded that the village ever assumed the management or control of the spur drain. The verdict of the jury in this case would impose on this village a standard of conduct and a duty which transcends that ordinary care which should be and is the established obligation of the village. Roche v. City of Minneapolis, 223 Minn 359, 27 NW2d 295, 173 ALR 1020.

Accordingly, the judgment of the trial court is reversed and the cause remanded to that court with directions to enter a judgment non obstante veredicto.

Reversed and remanded.

CRAVEN and TRAPP, JJ., concur.